# IN THE SUPREME COURT OF IOWA

No. 14–0820

Filed May 6, 2016

**ELYSE DE STEFANO,**

Appellant,

vs.

**APTS. DOWNTOWN, INC.,**

Appellee.

Appeal from the Iowa District Court for Johnson County, Nancy A. Baumgartner, Judge.

A tenant appeals and a landlord cross-appeals a district court ruling affirming in part and reversing in part a small claims court decision in a residential landlord–tenant dispute. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Christopher S. Warnock, Iowa City, and Christine E. Boyer, Iowa City, for appellant.

Robert M. Hogg  and James W. Affeldt of Elderkin & Pirnie, P.L.C., Cedar Rapids, and C. Joseph Holland, Iowa City, for appellee.

**APPEL, Justice.**

This case is a landlord–tenant dispute that was initially tried as a small claims matter. The case presents a preliminary question of first impression, namely, whether an award of attorneys' fees should be considered as part of the "amount in controversy" for purposes of determining the jurisdiction of the small claims court. If there is subject matter jurisdiction, the case includes several important issues under the Iowa Uniform Residential Landlord and Tenant Act (IURLTA), including (1) whether a landlord may enter into a contract with a tenant that requires the tenant to assume the cost of making repairs necessary to maintain the premises in a fit and habitable condition, (2) whether a landlord can refuse to approve a sublease based upon the refusal of the tenant to assume the cost of maintaining the premises in a fit and habitable condition, (3) whether a landlord may automatically deduct a fee for carpet cleaning at the conclusion of the lease term, and (4) whether statutory punitive damages are available for willful violation of the IURLTA in this case.

The landlord rented a four-bedroom home to four students in the college community of Iowa City. An exterior door and door lock to the premises were damaged due to third-party vandalism, requiring repair in order to maintain a fit and habitable premises. When the landlord was informed of the damaged door, the landlord repaired it but billed the tenants for the cost. The tenants refused to pay. When the tenants subsequently sought to sublease the apartment for two summer months, the landlord refused to approve the sublease on the ground that the tenants had failed to pay for the repairs and the penalties assessed for nonpayment. The tenants still refused to pay. As a result, the landlord

refused to approve the sublease, and the premises was vacant for the last two months of the lease term.

At the conclusion of the lease term, the landlord then withheld the tenants' rental deposit. The landlord withheld the rental deposit by asserting that (1) the tenants owed the landlord for the cost of repairing the damaged door, (2) the tenants incurred penalties under the lease for failing to timely pay for the damaged door, (3) the tenants were automatically obligated to pay the landlord for the cost of cleaning the carpet upon their surrender of the premises at the end of the lease term regardless of the condition of the carpet, and (4) the tenants owed the landlord various other relatively minor fees and costs of no relevance to this appeal.

One of the tenants, Elyse De Stefano, sued in small claims court, claiming that the landlord improperly withheld the rental deposit. The magistrate held for the tenant on most issues and awarded damages of $4720. The magistrate did not award attorneys' fees to De Stefano because no attorney fee affidavits were filed. The landlord appealed to district court.

On appeal, the district court upheld some but not all of the magistrate's decision. The district court concluded that under the terms of the lease, the landlord could charge the tenant for the replacement of the exterior door that had been vandalized by a person or persons unknown. The district court also found the landlord properly refused to allow the proposed sublease in light of the tenant's refusal to pay for the exterior door. As a result, the tenant was liable to the landlord for rent during the two summer months when the premises was vacant. The district court found, however, that the landlord's automatic deduction from the rental deposit for carpet cleaning violated the IURLTA and that

certain late fees imposed by the landlord were improper. In the end, the district court awarded De Stefano $651.54 for the balance of the deposit improperly withheld and $200 in statutory punitive damages.

After trial, the attorneys for De Stefano sought fees under the terms of the IURLTA and submitted two separate fee affidavits supporting the fee claims. The district court awarded $1160 in attorneys' fees, the sum claimed in a fee affidavit submitted by attorney Christine Boyer. The district court declined to award attorneys' fees claimed in a fee affidavit submitted by attorney Christopher Warnock for $5466.

Both parties appealed, and we granted discretionary review. For the reasons that follow, we affirm in part and reverse in part the decision of the district court on tenant's appeal. We affirm in part and reverse in part the district court's ruling on the landlord's cross-appeal. We reverse and remand the case to the district court.

**I. Background Facts and Proceedings.**

In July 2010, four University of Iowa students—Elyse De Stefano, Hillary Block, Meghan Crotty, and Jennifer Connelly—rented a four-bedroom home in Iowa City from Apts. Downtown, Inc., (Apartments Downtown) under a written lease agreement. The period of the lease was from July 31, 2010, to July 26, 2011. The collective rent was $1635 per month, and the tenants paid a rental deposit of one month's rent.

The preprinted lease contained seventy tightly-spaced paragraphs featuring many subparts and considerable detail. In paragraph 30 the lease provided, "Tenants agree to pay for all damages to the apartment windows, screens, and doors, including exterior unit doors (including random acts of vandalism)." The lease also provided in paragraph 33, "Unless the Landlord is negligent, Tenants are responsible for the cost of all damages/repairs to windows, screens, doors, carpet, and walls,

regardless of whether such damage is caused by residents, guests or others." Additionally, the lease contained a $452–$690 estimated cost for the repair or replacement of a prehung entry door.

The lease further provided that Iowa City Maintenance would perform all repairs "unless written authorization is secured from [the] Landlord." It stated that Iowa City Maintenance charges $70 per hour during regular business hours and $90 per hour during nights and weekends, with a minimum of one hour per service call. Iowa City Maintenance is an alter ego of Apartments Downtown.

Furthermore, the lease included an automatic charge for carpet cleaning at the conclusion of the lease term. Specifically, the lease stated as follows:

> The carpets throughout the building are professionally cleaned each time apartments turn over occupancy. Tenants agree to a charge starting at $95 (efficiency) not to exceed $225 (6+ bedrooms) being deducted from the deposit for professional cleaning at the expiration of the Lease.

The four student tenants, including De Stefano, took possession and paid the regular rent on a monthly basis for the duration of the lease, including for the months of June and July, 2011 after failing to receive Apartments Downtown's approval for a sublease.

On August 25, 2011, the student tenant whose forwarding address had been provided to the landlord received a "Security Deposit Statement 2011"[1] from Apartments Downtown detailing the following charges to the tenants' rental account:

| Carpet Cleaning: | $ 191.00 |
| Cleaning Charges: | $ 280.00 |

---

[1]This opinion follows Iowa Code section 562A.12(3) in referring to this as a "rental deposit," but we consider any reference to a "security deposit" to be synonymous.

| | |
|---|---|
| Past Due Rent & Fees on Acct: | $1,308.45 |
| Lawn Clean Up: | $ 60.00 |
| Screens (Kitchen, BR 2): | $ 150.00 |
| Blinds (BR 2, 4): | $ 99.00 |
| Removal & Disposal of Tenants Items (Bed mattress in front lawn): | $ 50.00 |
| Total Deductions (-) | $2,138.45 |
| Total Due: | $ (503.45) |

The past-due rent and fees in the amount of $1308.45 consisted of charges of $210 for lawn care in June 2011; $598.46, the total cost for a replacement exterior door; $150 of late fees for failure to timely pay for the replacement door; and $349.99, the cost of replacing a refrigerator gasket and two broken screens found during a June 2011 maintenance inspection. The statement instructed the tenants to pay the $503.45 due on the account within thirty days.

The door replacement charge and the subsequent late fees stemmed from a burglary that occurred at De Stefano's residence in October 2010. De Stefano and the other tenants filed a police report with the Iowa City Police Department. The report stated that the burglary had left the exterior doorframe damaged and the door lock broken.[2] Apartments Downtown was called to repair the door on October 11. It arranged for Iowa City Maintenance, its in-house maintenance group, to replace the kicked-in door, and the charges were billed to De Stefano and her roommates. The total cost of the repair and replacement was $598.46, which included $318.46 for the replacement door and $280 for four hours of labor. Upon receipt of this charge, one of De Stefano's cotenants sent a letter dated November 2 to Apartments Downtown, contesting the charge and advising that the damage was not

---

[2]The front door was split for a length of approximately twelve inches around the latch and deadbolt, and the frame was damaged as a result of being "kicked in" during a burglary. This damage rendered the front door of the house unlockable.

caused by any of the tenants and the police investigation was ongoing. The student tenant, in a letter apparently written with the advice of counsel, referenced paragraph 30 of the lease agreement which stated: "Tenants agree to pay all damages to the apartment windows, screens, and doors, including exterior unit doors (including random acts of vandalism)." The tenant said she believed this lease provision to be unconscionable and thus unenforceable by a court.

> Apartments Downtown responded on November 17,
>
> By signing the lease agreement you agree to pay for all damages to the apartment windows, screens, and doors, including exterior unit doors, including random acts of vandalism. If . . . the door was broken down during a burglary, the destruction of the door is considered vandalism . . . . Even though the door was damaged during the break in, and not by a guest of the tenants, it still falls under the basis o[f] a visitor, whether they were a known guest or not. . . . [I]f the police investigation results in the finding of the guilty party that was responsible for the damage, then at that time we would be more than happy to charge said person(s) for the damage. Until then however, the damage incurred to the property fall[s] under the responsibility of the leased tenants. At this time you currently still have an outstanding balance of 598.46 on your account, if this would happen to still be current when December[']s rent comes due, it will accumulate the standard $40.00 late charge.

On December 2, De Stefano emailed Apartments Downtown and indicated that on the advice of counsel the tenants would not be paying for the door and that if Apartments Downtown held back their deposit they would take legal action. Apartments Downtown, apparently believing the email to be a request that the $598.46 be taken from the tenants' damage deposit at the end of the rental term, responded by email and referred De Stefano to a provision in the lease agreement stating that charges needed to be paid immediately or else late fees would accumulate. The email stated,

> [I]f you do not pay this bill, a $40 late charge will be applied to your rental account balance, which from now until the end of you[r] lease term would amount to an additional $320.00 in addition to the door balance.

In May 2011, De Stefano and the other tenants sought to sublet their apartment for the summer months. They located individuals interested in subleasing their rental property and contacted Apartments Downtown per the lease agreement, which stated, "[T]enants shall not sublet the dwelling unit . . . without the written consent of Landlord." The lease also provided, however, "Only apartments whose rental accounts are in good standing may sublease. All rent/fees on the account must be paid before Landlord consents to a sublease." Thus, Apartments Downtown refused to consent to any sublease because the tenants' rental account carried an unpaid balance consisting of the charges for the replacement door and subsequent late fees for nonpayment. De Stefano and the other tenants were not able to sublet their rental property.

On June 22, Apartments Downtown entered the tenants' rental property without proper notice to conduct an annual maintenance tour. Iowa City Maintenance employees repaired two bent window screens at a cost of $150 and replaced a torn refrigerator gasket at a cost of $129.99. Apartments Downtown added the total charge of $349.99 to the tenants' rental account, and it eventually became part of the "Past Due Rent and Fees."

A month later, De Stefano and the other tenants received an email from Apartments Downtown containing move-out and inspection information. The email also told the tenants, in bolded and capital letters, "Tenants Only Need to Vacuum Carpet!" Below, it stated, "As agreed to in the lease's addendum there will be a charge of $95-$225

deducted from the tenant's deposit to pay for professional carpet cleaning at the expiration of the lease." On July 26, Apartments Downtown performed a checkout inspection at the residence. After the inspection, the company arranged for carpet cleaning to be performed by a local company for a cost of $191.

On August 25, Apartments Downtown sent out its statement disclosing the amounts withheld from the rental deposit and the balance still owed. De Stefano responded with an email asking for the return of the deposit and characterizing the landlord's charges against the account as illegal and unreasonable. Apartments Downtown countered with a letter dated September 8, asserting that the deductions from the rental deposit complied with Iowa Code chapter 562A, which authorizes deductions from a rental deposit either for a tenant's default in payment of rent or to restore a unit to the condition it had been in at the commencement of the tenancy. The letter provided a reason for each charge and declined to remove any of the charges. The landlord's letter further requested that the tenants pay the balance on the account by September 25 to avoid future collections action. On September 19, the Apartments Downtown Department of Collections and Litigation sent De Stefano and the other former tenants individual letters demanding payment of the claimed $503.45 balance due on the rental account.

On October 4, De Stefano brought a small claims action against Apartments Downtown.[3] De Stefano's notice requested $5000 from Apartments Downtown as well as attorneys' fees and court costs. On October 28, De Stefano's case was stayed and consolidated with a

---

[3]De Stefano's standing to assert claims on behalf of herself and her three cotenants is not disputed.

different case pending against Apartments Downtown in the district court. The district court denied De Stefano's motion for partial summary judgment in the consolidated case on May 17, 2012. De Stefano then moved to transfer the case back to the small claims division, and the district court granted the motion on June 8.

On July 18, the parties appeared for trial in small claims court. De Stefano presented a number of claims, including (1) that the automatic carpet-cleaning charges in the lease were illegal, (2) that the charges for replacement of a door that had been wrecked during the burglary of the tenants' residence were unlawful, (3) that the tenants lost two months' rent because the landlord wrongfully refused to consent to their proposed sublease, (4) that punitive damages should be awarded under the IURLTA for the willful withholding of the rental deposit, and (5) that reasonable attorneys' fees should be awarded under the IURLTA.

The small claims court found that the carpet-cleaning provision in the lease was unenforceable, the lease provisions making tenants responsible for the damage to the door caused by a burglary were unconscionable and thus unenforceable, and punitive damages were warranted. The court applied various other deductions to the rental deposit not relevant to this appeal. The court awarded De Stefano $4520 in damages and $200 in statutory punitive damages for a total of $4720.

After the trial, De Stefano's cocounsels Warnock and Boyer filed two separate affidavits requesting attorney fees in the amounts of $5466 and $1160 be added to the judgment nunc pro tunc. Apartments Downtown resisted on the ground that the attorney fee applications were untimely and would result in damages in excess of the jurisdictional limits of the small claims court. The court declined to rule on the

applications because by then Apartments Downtown had appealed to the Johnson County District Court.

On appeal, the district court reversed in part and affirmed in part. The district court entered a number of holdings relevant to this appeal. First, the district court held that Apartments Downtown and its tenants "were free to reach an agreement holding the tenants financially responsible for repair of a door damaged by an alleged criminal act" and reversed that aspect of the small claims court's ruling. Second, "because the lease provision regarding the tenant's financial responsibility for damage to exterior doors . . . was not prohibited," the district court found that Apartments Downtown was free to refuse to consent to the proposed sublease due to tenants' failure to pay the door charge, and the court accordingly reversed on that issue as well. Third, the district court held that the automatic carpet-cleaning provision in its lease was "an illegal provision because it does not require the landlord to prove any specific damage to the carpet" and affirmed the small claims court on that ground. Fourth, the district court agreed with the small claims court that late fees for nonpayment of rent were not supported by actual evidence. Fifth, the district court concluded that "there was a bad faith retention of the security deposit based on, at a minimum, [Apartments Downtown]'s inclusion of the carpet-cleaning fee in the lease." The court additionally found that Apartments Downtown retained the rental deposit in bad faith by assessing late fees for nonpayment of the cost of the replacement door, when "late fees were only permitted for non-payment of rent."

The court's holdings reduced the award to De Stefano to $851.54. This figure was calculated by taking the $1635 deposit and reducing it by $385 (the deductions authorized by the small claims court and not

challenged by De Stefano on appeal) and \$598.46 (the charge for the door replacement), then adding on \$200 in punitive damages. Finally, the district court awarded De Stefano \$1160 in attorney fees because Iowa Code section 562A.12(8) allows for the award of reasonable attorney fees to the prevailing party. We granted both parties' requests for discretionary review and retained the appeal.

## II. Standard of Review.

"In a discretionary review of a small claims decision, the nature of the case determines the standard of review." *GE Money Bank v. Morales*, 773 N.W.2d 533, 536 (Iowa 2009). Our review of small claims actions tried at law is for correction of errors at law. *Midwest Check Cashing, Inc. v. Richey*, 728 N.W.2d 396, 399 (Iowa 2007). "A review of statutory construction is at law." *GE Money Bank*, 773 N.W.2d at 536. The district court's factual findings, however, are binding upon this court if supported by substantial evidence. *Id.*; *Barnhill v. Iowa Dist. Ct.*, 765 N.W.2d 267, 272 (Iowa 2009). We review the district court's award of attorneys' fees for abuse of discretion. *GreatAmerica Leasing Corp. v. Cool Comfort Air Conditioning & Refrigeration, Inc.*, 691 N.W.2d 730, 732 (Iowa 2005).

## III. Preliminary Small Claims Court Jurisdictional Analysis.

**A. Introduction.** Apartments Downtown challenges the subject matter jurisdiction of the small claims court. *See Tigges v. City of Ames*, 356 N.W.2d 503, 511 (Iowa 1984) (noting that "[s]ubject matter jurisdiction should be considered before the court looks at other matters involved in the case"). "Subject matter jurisdiction is the power 'of a court to hear and determine cases of the general class to which the proceedings in question belong, not merely the particular case then occupying the court's attention.' " *Klinge v. Bentien*, 725 N.W.2d 13, 15

(Iowa 2006) (quoting *Christie v. Rolscreen Co.*, 448 N.W.2d 447, 450 (Iowa 1989)). Jurisdiction over the subject matter of a claim must be conferred by a constitutional or statutory grant. *Id.* "The parties themselves cannot confer subject matter jurisdiction on the court." *Schott v. Schott*, 744 N.W.2d 85, 87 (Iowa 2008).

At the outset, it is important to precisely define the legal issue behind the subject matter jurisdictional challenge. The question is not a broad, freewheeling, hermeneutic issue of the meaning of "amount in controversy" or "cost." Instead, the issue is narrow. The issue is whether attorneys' fees that may be awarded pursuant to the IURLTA should be considered in determining whether the jurisdictional limitations of small claims proceedings are exceeded when the issue is not expressly addressed in the statutes.

**B. Relevant Statutory Provisions.** We begin our jurisdictional analysis with an overview of relevant statutory provisions. The small claims court has jurisdiction over those "civil action[s] for a money judgment where the amount in controversy is . . . five thousand dollars or less . . . exclusive of interest and costs." Iowa Code §§ 631.1(1), .2(1) (2011).[4] The legislature created this scheme for small claims because it "thought it was in the public interest to provide a simpler, easier, and less expensive procedure than was afforded in district court under the Rules of Civil Procedure." *Barnes Beauty Coll. v. McCoy*, 279 N.W.2d 258, 259 (Iowa 1979); *see* Iowa Legis. Ct. Study Comm'n, *Report to 62d Iowa General Assembly* pt. I, at 4 (1967) (proposing to the legislature a new court division that would hear claims using a "simple, expeditious, and inexpensive" procedure).

---

[4]All Code references are to 2011 unless otherwise indicated.

In small claims court, no pleadings are required—a claimant can begin an action by filling out a simple form. Iowa Code §§ 631.3, .7(1); *Barnes*, 279 N.W.2d at 259. Jurisdiction over the case is determined at the time set for the hearing of the small claim. Iowa Code § 631.9. If at any time a claim is joined that is not a small claim, the small claims court may order the entire action tried by regular procedure. *Id.* § 631.8(4). In the alternative, the court may separate the claims and try the small claims itself while transferring the others to the district court. *Id.*; *see also Wilson v. Iowa Dist. Ct.*, 297 N.W.2d 223, 225 (Iowa 1980) (noting that the small claims court properly ordered a case transferred when "the amount in controversy on one side of the case exceeded [the jurisdictional limit]" and the claims arose out of the same transaction).

Iowa Code chapter 631 does not provide a statutory definition of "amount in controversy" or "costs." There is a section in the chapter stating that certain "fees and costs" shall be collected in advance by the clerk of the district court. *See* Iowa Code § 631.6. The statute also provides that these items "shall be assessed as costs." *Id.* The items are fees for filings, fees for service of notice, postage, and fees for personal service. *Id.* The Code section simply lists items collected in advance by the clerk which are later assessed as costs under the statute. Attorneys' fees are not costs incurred in advance and later assessed in litigation, and as a result, it is not surprising that attorneys' fees are not mentioned in this Code provision.

The IURLTA has a number of provisions related to attorneys' fees. Iowa Code section 562A.12(8) provides that "[t]he court may, in any action on a rental agreement, award reasonable attorney fees to the prevailing party." Iowa Code section 562A.11 also has an attorneys' fee provision. "If a landlord willfully uses a rental agreement containing

provisions known by the landlord to be prohibited, a tenant may recover *actual damages* sustained by the tenant and not more than three months' periodic rent and *reasonable attorney fees*." *Id.* § 562A.11(2) (emphasis added). This section distinguishes between actual damages and attorneys' fees that may be awarded by the district court.

**C. Positions of the Parties.** Apartments Downtown did not challenge subject matter jurisdiction in either the small claims court or on appeal in the district court.[5] It now maintains, however, that the judgment below must be vacated because the amount in controversy exceeded small claims jurisdiction as soon as De Stefano filed attorney fee applications specifically requesting more than $280 on top of her $4720 damage award.

De Stefano sees things differently. She contends that attorneys' fees do not count against the $5000 jurisdictional limit in small claims court. De Stefano has two theories for why attorneys' fees do not count against the jurisdictional limit. First, she urges the IURLTA specifically authorizes attorneys' fees. The IURLTA provides, "The court may, in any action on a rental agreement, award reasonable attorney fees to the prevailing party." *Id.* § 562A.12(8). She looks to the IURLTA for support for her attorneys' fee argument.

Alternatively, however, De Stefano argues that the small claims statute should be interpreted as excluding attorneys' fees in determining the amount in controversy. According to Iowa Code section 631.1(1), a small claims action is a "civil action for money judgment where the

---

[5]Apartments Downtown did oppose De Stefano's attorney fee applications on the ground that they *would* result in an award in excess of small claims jurisdiction, but prior to this appeal never asserted that the small claims court (or the district court on appeal) had actually *lost* jurisdiction.

amount in controversy is . . . five thousand dollars or less . . . exclusive of interest and costs." De Stefano maintains the exclusion for "costs" applies here because attorneys' fees should be considered costs under the statute. De Stefano further argues that, as a practical matter, judges are reluctant to award attorneys' fees in landlord–tenant actions, and in any case such fees would rarely be awarded in amounts which would cause the total to exceed $5000 except in cases of an egregious violation of the IURLTA.

**D. Caselaw from Other Jurisdictions.** As indicated above, the precise issue in this case is whether attorneys' fees awarded pursuant to the IURLTA should be considered for purposes of determining the jurisdiction of small claims courts when the underlying statutes do not expressly address the issue. There are a number of cases from other states which address the question.

A leading case supporting the view that attorneys' fees should not be considered in determining the jurisdiction of New Jersey's version of small claims court is *Lettenmaier v. Lube Connection, Inc.*, 741 A.2d 591 (N.J. 1999). In that case, the question was whether an award of attorneys' fees under a New Jersey consumer fraud statute should be considered as part of the amount in controversy in New Jersey's version of small claims court. *Id.* at 591. The New Jersey Supreme Court, among other things, pointed to the underlying provision of the consumer fraud statute, which grouped attorneys' fees with "filing fees and costs." *Id.* at 594. In addition, the *Lettenmaier* court noted that "a majority of the out-of-state cases which have addressed the issue have held that counsel fees, not otherwise characterized, are to be considered as costs." *Id.* at 595.

Interestingly, the *Lettenmaier* court cited two Iowa cases as standing for the proposition that attorneys' fees cannot be considered in determining whether jurisdictional limits have been exceeded because attorneys' fees are "separate and distinct" events that cannot be assessed before liability is established. *Id.* (citing *Ayala v. Ctr. Line, Inc.*, 415 N.W.2d 603 (Iowa 1987); *Maday v. Elview-Stewart Sys., Co.*, 324 N.W.2d 467 (Iowa 1982)). The *Lettenmaier* court distinguished federal diversity cases where the question is whether attorneys' fees should be considered in order to *reach* the jurisdictional minimum. *Id.* The court noted that the analogy to federal diversity cases "loses its persuasive power entirely when it is applied to circumscribe a litigant's access to a court that is especially suited to his or her claims." *Id.* at 596.

The *Lettenmaier* court also considered practical implications of a contrary rule. The court noted that plaintiffs seeking a quick and relatively inexpensive resolution in small claims courts could face defense tactics of piling on attorneys' fees to exceed the jurisdictional maximum. *Id.* More importantly, the court feared that including attorneys' fees as part of the amount in controversy would put plaintiffs in the position of foregoing counsel fees in order to maintain the expedited process. *Id.*

A case from the Ohio Court of Appeals also supports leaving attorneys' fees out of the "amount in controversy" for jurisdiction—*Drake v. Menczer*, 425 N.E.2d 961 (Ohio Ct. App. 1980). This case involved a small claim brought under the Ohio Landlords and Tenants Act (OLTA), Ohio Revised Code chapter 5321. *Id.* at 962. Like *Lettenmaier*, the *Drake* court noted that "[t]raditionally, when a statute authorizes the award of attorneys' fees, it does so by allowing the fees to be taxed as costs." *Drake*, 425 N.E.2d at 963. The *Drake* court also focused on the

language of the OLTA, noting that its fee-shifting provisions provided for "actual damages together with reasonable attorneys' fees." *Id.* (quoting Ohio Rev. Code Ann. § 5321.02). The Ohio court concluded that the legislature intended damages and attorneys' fees to be separate items, and attorneys' fees should be taxed as costs. *Id.* at 964; *see also Bittner v. Tri-Cty. Toyota, Inc.*, 598 N.E.2d 925, 928 (Ohio Mun. Ct. 1992) (attorneys' fees arising from consumer protection statute are considered costs and not damages for purposes of jurisdictional limitation in municipal courts).

In *Arabian v. Kearns*, the Oregon appellate court considered whether attorneys' fees should be considered in determining the amount in controversy under an Oregon small claims statute. 667 P.2d 1038, 1039 (Or. Ct. App. 1983) (en banc). The Oregon court concluded that attorneys' fees should not be included in determining the jurisdictional limit. *Id.* at 1040. Among other reasons, the Oregon court stressed that attorneys' fees are not a matter of proof during trial, but are instead determined after trial and are procedurally treated like costs and disbursements. *Id.* This reasoning is close to that in *Lettenmaier*, where the New Jersey Supreme Court relied on Iowa cases making that point.

A Wisconsin appellate court considered the issue in *Reusch v. Roob*, 610 N.W.2d 168 (Wis. Ct. App. 2000). In that case, the Wisconsin appellate court considered whether statutory attorneys' fees awarded under a Wisconsin consumer protection statute should be included for purposes of determining the jurisdiction of a small claims court. *Id.* at 178. The *Reusch* court concluded that statutory attorneys' fees should not be included. *Id.* at 179. The court reasoned that the attorneys' fees awarded pursuant to consumer protection statutes were not designed to

compensate victims for damages but instead to compensate attorneys for their services. *Id.*

The *Reusch* case was cited with approval by the Wisconsin Supreme Court in *Roehl Transport, Inc. v. Liberty Mutual Insurance Co.*, 784 N.W.2d 542 (Wis. 2010). In a footnote, the Wisconsin Supreme Court, citing prior precedent, noted the "subtle but significant difference between attorney[s'] fees attributable to bringing a lawsuit and those recoverable as damages resulting from a tort." *Id.* at 572 n.65. The court emphasized that attorneys' fees attributable to bringing a lawsuit are "intended to compensate the attorneys, whereas [damages are] intended to compensate the victims." *Id.*

There are cases that seem to stand for the contrary. For example, Texas courts have generally held that in determining the amount in controversy for jurisdictional purposes, actual damages, exemplary damages, and attorneys' fees are included. *See Villarreal v. Elizondo*, 831 S.W.2d 474, 476 (Tex. App. 1992). This rule is qualified, however, by the notion that a plaintiff may seek additional damages exceeding the jurisdictional limits if they have occurred as a result of the passage of time. *Id.* Similarly, in *Pinnacle Properties v. Saulka,* an Indiana appellate court held that attorneys' fees should be included in determining the amount sought for purposes of determining the jurisdiction of a small claims court. 693 N.E.2d 101, 106 (Ind. Ct. App. 1998). The Indiana court noted that the small claims statute did not explicitly distinguish between attorneys' fees and damages. *Id.*

**E. Iowa Caselaw.** There is no Iowa caselaw directly on point on the narrow jurisdictional question presented here. There are two cases, however, that were cited by *Lettenmaier* that may have bearing on the

question of whether attorneys' fees should be considered in determining the amount in controversy for purposes of jurisdictional limitations.

In *Maday*, we considered a question of attorneys' fees in the context of Iowa Code chapter 91A, the Wage Payment Act. 324 N.W.2d at 468. The precise question posed was whether attorneys' fees should be determined by a judge or jury in proceedings brought under the statute. *Id.* at 469. In *Maday*, we sided with authorities treating statutory allowance of attorneys' fees as costs logically assessable by the court. *Id.* at 469–70.

We reached a similar result in *Ayala*. There, the question was whether a judge or jury should determine an award of attorneys' fees under the Iowa Civil Rights Act. *Ayala*, 415 N.W.2d at 604. We observed that "an award of attorney fees is more in the nature of an equitable remedy than an award of actual damages." *Id.* at 605. We further noted the assessment of attorneys' fees, like the assessment of court costs, cannot be done until liability is established. *Id.* at 606. We therefore, as in *Maday*, determined the question of attorneys' fees should be handled in the same manner as costs, namely, decided by the court after trial of the underlying matter. *Id.*

We have also considered whether costs includes attorneys' fees in significantly different contexts than what we face in this case. For instance, in *Weaver Construction Co. v. Heitland*, we held that the term "costs" in Iowa Code chapter 677 could not be interpreted as including attorneys' fees. 348 N.W.2d 230, 233 (Iowa 1984). Similarly, in *Turner v. Zip Motors*, we held that the use of the term "costs" in Iowa Code section 625.1 should not be interpreted to include attorneys' fees. 245 Iowa 1091, 1100, 65 N.W.2d 427, 432 (1954). These cases, however, deal with the question of whether the term "cost" or "costs" is sufficient to create a

substantive fee-shifting provision contrary to the ordinary American rule that each party bears the expense of fees charged by their attorneys. These cases simply do not address the question of whether a reference to costs in a jurisdictional statute includes attorneys' fees when there is a separate statutory authority to shift the costs of attorneys' fees to the other party.

**F. Analysis.** In interpreting section 631.1, we begin with the statutory language. *See In re Marriage of Thatcher*, 864 N.W.2d 533, 538 (Iowa 2015). "Words or phrases that are undefined in the statute or for which there is no established legal meaning are given their common, ordinary meaning in the context within which they are used." *Bank of Am., N.A. v. Schulte*, 843 N.W.2d 876, 880 (Iowa 2014). If the statute is unambiguous, we will look no further than the language chosen by the legislature. *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). "Under the pretext of construction, we may not extend a statute, expand a statute, or change its meaning." *Bank of Am.*, 843 N.W.2d at 880.

Yet, we have cautioned that courts "should be circumspect regarding narrow claims of plain meaning and must strive to make sense of [a statute] as a whole." *Rolfe State Bank v. Gunderson*, 794 N.W.2d 561, 564 (Iowa 2011). The meaning of language is often not self-evident. "Whether or not the words of a statute are clear is itself not always clear." *Barbee v. United States*, 392 F.2d 532, 535 n.4 (5th Cir. 1968). When a statute is ambiguous, we may look to a wide variety of intrinsic and extrinsic aids to discover the meaning of the legislative language. *State v. McIver*, 858 N.W.2d 699, 704 (Iowa 2015). We recognize, however, that use of various resources and interpretive aids do not mechanically and automatically produce inescapable answers. *See* 2A

Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction*, § 45.13, 137–38 (7th ed. rev. 2014).

We have little trouble noting that the meaning of the terms "amount in controversy" and "costs" for purposes of determining the limits of small claims jurisdiction under Iowa Code section 631.1 cannot be resolved by simply declaring a plain meaning. Both terms are open-textured and can include and exclude a wide variety of items, depending on context. The ambiguity of the statutory terms is demonstrated by legislative usage. In some contexts, the legislature has expressly said that costs *includes* attorneys' fees. For example, Iowa Code section 6B.33 authorizes payment of all costs in appeals of condemnation proceedings "including reasonable attorney fees."[6] In other contexts, the

---

[6]*See, e.g.*, Iowa Code § 207.14(5) (2015) (allowing court to assess "all reasonable costs and expenses, including reasonable attorney fees" in administrative proceeding regarding coal mining inspection); *id.* § 421B.10 (awarding "costs of suit, including reasonable attorney fees" to plaintiffs for established violations of cigarette sales statutes); *id.* § 455B.111(4) (authorizing award of costs including attorney fees to any party in action for natural resources statute violations); *id.* § 501A.801(4)(*h*) (allowing court to order payment of "party's reasonable costs, including reasonable attorney fees" in suits over the inspection of business records); *id.* § 504.1604(3) (requiring any court ordering nonprofit corporation to allow the inspection of its records by a member to also "pay the member's costs, including reasonable attorney fees"); *id.* § 507C.46(2) (stating that any applicant for assets in insurer liquidation "shall pay the costs and expenses of the liquidator in resisting the application including a reasonable attorney fee"); *id.* § 533C.705 (assessing costs including reasonable attorney fees against persons who violate the Uniform Money Services Act); *id.* § 535B.13(3) (allowing court to order that unlicensed banker "pay the costs for the investigation and prosecution of the enforcement action including attorney fees"); *id.* § 552A.5(3) (stating that persons injured by violations of statutory prescriptions for sale of club memberships may recover "costs, including reasonable attorney fees"); *id.* § 553.12(4) (allowing injured person or state to "[r]ecover the necessary costs of bringing suit, including a reasonable attorney fee" under Iowa competition law); *id.* § 598.24 (levying costs, including attorney fees against a party in contempt in a divorce proceeding); *id.* § 600B.25 (allowing court to award prevailing party in a paternity suit "the reasonable costs of suit, including but not limited to reasonable attorney fees"); *id.* §§ 633.551(5), .673 (assessing the costs, including attorney fees, of a guardianship against ward or ward's estate); *id.* § 633A.4507 (permitting court to award costs including reasonable attorney fees to any party in a proceeding on the administration of a trust); *id.* § 654.17(2) (allowing mortgagee to charge mortgagor "the costs, including reasonable attorney fees, of

legislature had declared that the court may tax "as costs" a reasonable attorney fee. For instance, in Iowa Code section 625.22 the general assembly provided that "[w]hen judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and tax as part of the costs a reasonable attorney fee to be determined by the court."[7] This legislative language plainly suggests that, at least in some contexts, the simple term "costs" is broad enough to include attorney fees.

Yet, in other statutes, the legislature has referred to attorneys' fees and costs as separate and distinct items.[8] In addition, although the

_____

foreclosure and rescission"); *id.* § 714.16(11) (entitling attorney general to recover costs of court action, including reasonable attorneys' fees, in consumer fraud action); *id.* § 714.16B(1)(*b*)(3) (providing for recovery of attorney fees as part of reasonable costs of bringing a civil action for identity theft); *id.* § 715A.2A(3)(*b*) (assessing against any employer that accommodates fraud the costs of an enforcement action including attorney fees).

[7]*See, e.g.*, Iowa Code § 202B.401(2)(*b*) (2015) (awarding attorney fees that are "taxed as part of the costs of the action" to parties prevailing in actions for agricultural processing violations); *id.* § 202C.3(1) (taxing attorney fees as part of the costs of a legal action for breaching a sales agreement); *id.* § 257B.33 (awarding compensation for attorney fees to be taxed as costs in actions by school boards to recover debts); *id.* § 327D.16 (allowing court to tax as "costs in the case," the costs of suit and a reasonable attorney fee); *id.* § 479.46(6) (prescribing that pipeline company pay all costs of appealing an assessment of installation damages "including reasonable attorney fees to be taxed by the court"); *id.* § 479B.30(6) (same for construction damages); *id.* § 502.509(5) (awarding attorney fees taxed as court costs to clients maintaining actions against unregistered investment advisers); *id.* § 573.21 (allowing court to tax, as costs, attorney fees for parties establishing a claim for labor or materials on public improvements); *id.* § 717A.3(2)(*b*) (awarding "reasonable attorney fees, which shall be taxed as part of the costs of the action," to prevailing plaintiffs in actions for damage to crops); Iowa R. Civ. P. 1.1225 ("On partition of real estate, but not of personal property, the court shall fix, and tax as costs, a fee in favor of plaintiff's attorney . . . .").

[8]*See, e.g.*, Iowa Code § 21.6(3)(*b*) (2015) (requiring a court to "order the payment of all costs and reasonable attorney fees" to a person prevailing on an open meetings claim); *id.* § 22.10(3)(*c*) (providing that a court shall "order the payment of all costs and reasonable attorney fees" to a person prevailing on an open records claim); *id.* § 80A.16A(2) (authorizing costs and reasonable attorney fees as part of recovery for persons injured by actions of bail enforcement agents); *id.* § 91A.8 (making an employer that intentionally fails to pay wages liable for "court costs and any attorney's fees incurred in recovering the unpaid wages"); *id.* §§ 216.15(9)(*a*)(8), .17A(6)(11) (allowing

context is different, we have not interpreted the word "costs" when used alone in a statute to be inclusive of attorney fees. *See Weaver*, 348

---

plaintiff in discriminatory housing or wage action to recover reasonable attorney's fees and court costs); *id.* § 217.31 (providing that any entity that disseminates confidential records is liable for "court costs, expenses, and reasonable attorney fees"); *id.* § 252B.13A(1) (stating that child "support payments do not include attorney fees [or] court costs"); *id.* § 252K.313(3) ("The tribunal shall order the payment of costs and reasonable attorney's fees if it determines that a hearing was requested primarily for delay."); *id.* § 322G.8(3) (allowing consumer to recover pecuniary loss, "reasonable attorney's fees, and costs" in action over defective motor vehicle); *id.* § 327C.21 (permitting court to "render judgment for costs, and attorney's fees for counsel representing the state" in actions against railroads for violations of duties owed to the public); *id.* § 502.509(2)(*c*), (3)(*c*) (permitting award of costs and reasonable attorney fees in securities actions); *id.* § 523D.7(1) (permitting recovery of "court costs and reasonable attorney fees" from provider of continuing care for violations of chapter 523D); *id.* § 523H.13 (creating liability for both costs and reasonable attorney fees for violators of chapter regarding franchises); *id.* §§ 535.8(4)(*d*), .11(8) (allowing for recovery of both costs and attorney fees from lender or creditor who collects an unlawful charge); *id.* § 535A.6(2) (permitting court to award actual damages, court costs, and attorney fees if financial institution committed a "red-lining" violation); *id.* § 537.3621 (authorizing a consumer's recovery of attorney fees and court costs); *id.* § 551A.8 (authorizing awards of reasonable attorney fees and court costs for violations of disclosure in business opportunity promotions); *id.* § 572.32(1) (permitting prevailing plaintiff to recover reasonable attorney fees in action to enforce mechanic's lien); *id.* § 598B.312(1) (awarding to prevailing parties seeking child support costs and attorney fees along with other expenses of proceedings); *id.* § 633.713(4) (stating that court may assess expenses including attorney fees and court costs against party engaging in unjustifiable conduct regarding guardianship proceeding); *id.* § 649.5 (permitting court to "assess, in addition to the ordinary costs of court, an attorney fee" to a successful plaintiff in an action to quiet a title); *id.* § 663A.1(6)(*a*) (listing as part of the damages recoverable by a wrongfully imprisoned person "court costs imposed and paid and any reasonable attorney's fees"); *id.* § 685.3(6)(*b*) (enabling recovery of "litigation costs and reasonable attorney fees" by certain whistleblowers); *id.* § 692.6 (making entities disseminating criminal history information in violation of chapter liable for "court costs, expenses, and reasonable attorney fees"); *id.* § 714B.8(2) (providing for recovery of "[c]osts and reasonable attorney fees" when a person suffers pecuniary loss because of a violation of the prize promotion law); *id.* § 714D.6(1)(*c*) (allowing for recovery of "[c]osts and reasonable attorney fees" in an action by a consumer against a telecommunications provider for fraud); *id.* § 714G.11 (permitting attorney general to seek "a monetary award for civil penalties, attorney fees, and costs" for consumer credit violations); *id.* § 729.6(8) (awarding as part of relief to an aggrieved party under genetic testing laws attorney fees and court costs); *id.* § 729A.5 (providing that hate crime victims may bring an action for "reasonable attorney fees[] and costs"); *id.* § 809A.12(7) (requiring agency bringing forfeiture action to pay reasonable attorney fees and costs); *id.* § 910.2(1) (listing "court costs" and the "court-appointed attorney fees" as separate charges to be payable by any convicted offender).

N.W.2d at 233 ("We do not agree, however, that the word 'costs' [in chapter 677] should be so liberally stretched as to include attorney fees."); *Turner,* 245 Iowa at 1100, 65 N.W.2d at 432 ("[Section 625.1] has always been held to mean the ordinary costs, not including attorney fees.").

We should be careful not to extrapolate too much from the foregoing statutes and authorities. They do suggest, however, that the threshold test of ambiguity has been crossed and that we may resort to interpretive tools to guide us in determining the narrow issue presented here.[9]

In order to aid us in determine the meaning of costs in the small claims statute where a substantive statute authorizes the payment of attorneys' fees, we turn to historical precursors of our current small claims statute. Before the passage of the Unified Trial Court Act in 1972—1972 Iowa Acts chapter 1124—Iowa had justice-of-the-peace courts with limited amount-in-controversy jurisdiction. *See* Iowa Code §§ 602.1–.56 (1971). The legislature created the small claims division of the Iowa district courts to replace the justice-of-the-peace courts and the other inferior courts that had previously resolved small civil disputes. Suzanne E. Elwell & Christopher D. Carlson, *The Iowa Small Claims Court: An Empirical Analysis,* 75 Iowa L. Rev. 433, 453–60 (1990) [hereinafter Elwell]. Under the former system, we viewed contractual

---

[9]Prior to 1980, contractual attorneys' fees were a percentage of the recovery. *See* Iowa Code § 625.22 (1979) (authorizing court to tax as costs an attorney fee set as a percentage of the amount recovered). Thereafter, courts were authorized to award reasonable attorneys' fees. *See* Iowa Code § 625.22 (1981) (authorizing court to award a reasonable attorney fee). One could argue that once courts were given authority to determine reasonable attorneys' fees, it no longer became possible to tax them in the same mechanical manner that costs were taxed. Yet the "tax" terminology remained in the statute.

attorneys' fees as equivalent to costs for amount-in-controversy purposes and thus excluded them in computing the jurisdictional limit:

> One question certified and argued seems properly to arise from the record, and is of a determinative character; and that is, as to whether, in determining the jurisdiction of the justice, where a question is made as to the amount in controversy, an attorney's fee provided for in the note is to be considered a part of the amount in controversy, or treated as costs.
>
> The statute expressly declares that it shall be treated as a part of the costs. Section 2 of act above cited. The amount in controversy, then, was not more than $100, and the justice had jurisdiction.

*Spiesberger Bros. v. Thomas*, 59 Iowa 606, 609, 13 N.W. 745, 746 (1882).

Fifty years later, we reiterated this point:

> [W]e know of no case holding that in determining the question of jurisdiction, the prayer for costs is taken into consideration in determining the amount in controversy. The right to recover costs is a statutory one, and an incident of the litigation. It is equally true that contracts may provide for attorney's fees, and courts have recognized the right to so provide; but the statute provides they should be taxed as a part of the costs. The amount thereof is fixed by statute, and therefore is not a matter of controversy between the parties. They are in the same category as any other statutory costs incident to litigation, and cannot be taken into consideration in determining the amount in controversy between the parties. In other words, the claim of $50 for attorney's fees made by the plaintiff is simply a claim for costs, the same as for any other costs incident to the litigation.

*Johnson v. Boren*, 215 Iowa 453, 455–56, 245 N.W. 711, 712–13 (1932).

Given that the 1972 legislation did not explicitly address how attorneys' fees were to be handled for jurisdictional amount purposes, apart from stating that costs should be excluded, we think it is fair to infer the general assembly intended a continuation of prior law. *See Iowa Farm Bureau Fed'n v. Envtl. Prot. Comm'n*, 850 N.W.2d 403, 434 (Iowa 2014) ("The legislature is presumed to know the state of the law,

including case law, at the time it enacts a statute." (quoting *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 600 (Iowa 2011))).  The cost exclusion for jurisdictional amount purposes therefore would extend to contractual attorneys' fees.

Of course, this does not directly answer the question of how *noncontractual* attorneys' fees should be treated.  The existence of "a written contract containing an agreement to pay an attorney's fee" upon which a judgment has been recovered is a clear condition precedent to the application of section 625.22.  *See, e.g., Bankers Trust Co. v. Woltz*, 326 N.W.2d 274, 277–78 & n.4 (Iowa 1982) (applying section 625.22 to a surety contract).  So, section 625.22 does not apply here.

We have previously stated, however, that statutory, noncontractual attorneys' fees are likewise taxed and treated as costs:

> When a statute provides for attorney fees but is silent as to their ascertainment, we find the better rule to be that "[w]here attorneys' fees are allowed to the successful party, they are in the nature of costs and are taxable and treated as such."

*Maday,* 324 N.W.2d at 469 (quoting 20 Am. Jur. 2d *Cost* § 72 (1965)); *see also Ayala,* 415 N.W.2d at 605.  As indicated above, *Maday* and *Ayala* were cited in *Lettenmaier* in support of its holding that attorneys' fees are not included within the amount in controversy for purposes of determining the jurisdictional limits of small claims courts.

As noted above, prior to the 1972 Unified Court Act, we had made clear that because contractual fees were taxed as costs, they were therefore excluded from the amount-in-controversy calculation.  Since other attorneys' fees authorized by statute are likewise taxed as costs, it seems incongruous they would be treated differently—i.e., deemed part of the amount in controversy.  This would go against the holdings of

*Spiesberger* and *Johnson* that amounts taxed as costs do not count against the jurisdictional limit. *Johnson,* 215 Iowa at 455–56, 245 N.W. at 712–13; *Spiesberger,* 59 Iowa at 608, 13 N.W. at 746. Treating such fees as costs for section 631.1 purposes avoids a seemingly odd situation where attorneys' fees sometimes would and sometimes would not count toward the amount in controversy, depending on the basis for those fees.

Further, we think the reasoning contained in the out-of-state caselaw declining to include attorneys' fees awarded pursuant to statute in determining the limits of small claims jurisdiction is persuasive. As pointed out in *Reusch,* the purpose of statutory fees is not to compensate plaintiffs for their damages, but to compensate attorneys. 610 N.W.2d at 179. This reasoning suggests that an award of statutory attorneys' fees should not be included for small claims jurisdictional purposes. *See id.*

As suggested in *Lettenmaier* and *Arabian,* the fact that statutory attorneys' fees are ordinarily not determined by the fact finder, but are treated like other costs, indicates that when there is a statutory basis for awarding attorneys' fees they should be treated as costs and not as an amount in controversy under a small claims statute. *See Lettenmaier,* 741 A.2d at 596; *Arabian,* 667 P.2d at 1040. Further, the *Lettenmaier* court looked to the underlying fee-shifting statute, noting that attorneys' fees were grouped with filing fees and costs. *Lettenmaier,* 741 A.2d at 594; *see also Drake,* 425 N.E.2d at 963–64 (looking to language of underlying fee-shifting statute to determine if attorneys' fees are to be included in determining small claims jurisdiction). Here, the underlying statute clearly distinguishes between damages and attorney fees. Iowa Code § 562A.12(3), (7), (8).

We acknowledge that the treatment of costs under the federal diversity statute seems inconsistent with our view at first blush. Under

the federal diversity statute, federal courts have jurisdiction over disputes between citizens of different states when the amount in controversy exceeds $75,000, "exclusive of interest and costs." 28 U.S.C. § 1332 (2012). Contractual and statutory attorneys' fees generally count against the jurisdictional limit, *see* 14AA Charles A. Wright et al., *Federal Practice and Procedure* § 3712, at 806–12 (2011), and our legislature employed the same phrase—"exclusive of interest and costs"—in the Unified Court Act in 1972. 1972 Iowa Acts ch. 1124, § 60 (codified at Iowa Code § 631.1 (1973)). Yet, as noted in *Lettenmaier*, including attorneys' fees against the jurisdictional limit in the context of the federal diversity statute is designed to expand access to the federal court for substantial cases, not contract access to small claims court where matters are efficiently and expeditiously resolved. 741 A.2d at 596.

We recognize that small claims court is meant to provide a simple and streamlined judicial process with limited dollar amounts at stake. *See Barnes*, 279 N.W.2d at 259. Attorneys' fees, unlike traditional court costs and interest, can have a substantial impact on financial risks posed by the litigation. If attorneys' fees are not included in calculating the small claims jurisdictional limits, fee shifting can have the effect of significantly raising defendants' exposure.

There can be little question, however, that landlord–tenant disputes are ordinarily the kind of dispute that should be resolved in small claims court. Tenants are generally quite mobile, and drawn-out proceedings could impair the ability of tenants to vindicate their statutory rights. Small claims court will often be the most preferable forum.

Yet, without a lawyer, it will often be very difficult for tenants to litigate these small claims.[10] This case is a good example of the kind of case that simply could not realistically have been prosecuted by student tenants on a pro se basis. We want to encourage the use of small claims procedure for landlord–tenant disputes, not put the preferred forum at risk simply because tenants are represented by competent and zealous counsel.

For all the reasons stated above, we are persuaded that the exclusion of costs in Iowa Code section 631.1 applies to amounts "taxed as costs," i.e., attorneys' fees when separately authorized. Accordingly, the small claims court had jurisdiction to hear this case. Our opinion is limited to section 631.1 and should not be taken as expressing a view that when the term "costs" is used in other contexts, it encompasses attorneys' fees.

**IV. Duties of Landlord and Tenant Regarding Damaged Exterior Door.**

**A. Development of the Implied Warranty of Fitness and Habitability.**

1. *Historical overview.* The law related to landlord–tenant relationships has evolved over time. For centuries, landlord–tenant law was governed by property law. *See* Russell E. Lovell, *The Iowa Uniform Residential Landlord and Tenant Act and the Iowa Mobile Home Parks Residential Landlord and Tenant Act*, 31 Drake L. Rev. 253, 256–57 (1981) [hereinafter Lovell]; *see also Mease v. Fox,* 200 N.W.2d 791, 793

---

[10]According to one source, landlords are represented by counsel in twenty-five percent of the small claims cases. *See* Elwell, 75 Iowa L. Rev. at 471. Consultation with attorneys appears to occur between thirty-four percent for plaintiffs and thirty-one percent for defendants in tenant claims. *Id.* at 490, Table J.

(Iowa 1972). The right to possess land for agricultural purposes was thought to be at the heart of the transaction, and as a result, the landlord had no obligation to repair structures located on the property. *See Mease*, 200 N.W.2d at 793. Further, the common law recognized an independent doctrine under which the tenant's obligation to pay rent was independent of the landlord's obligation to the tenant. Donald E. Campbell, *Forty (Plus) Years After the Revolution: Observations on the Implied Warranty of Habitability*, 35 U. Ark. Little Rock L. Rev. 793, 796–97 (2013) [hereinafter Campbell].

With industrialization and urbanization, however, common law courts began to take a second look at the traditional no-repair doctrine. *See id.* at 797. In the modern age, many landlord–tenant relationships involved residences in which the core interest of the tenant was appropriate living space, not sprawling land for crop production. *See id.* at 799. While the yeoman farmer could generally maintain land for agricultural purposes as well as the landlord, modern city dwellers lacked the ability to make necessary repairs of residential property. *See* Lovell, 31 Drake L. Rev. at 259. Further, many courts noted the disparity of bargaining power between landlords and tenants. *See, e.g.*, *Knight v. Hallsthammar*, 623 P.2d 268, 271 (Cal. 1981) (en banc); *Park W. Mgmt. Corp. v. Mitchell*, 391 N.E.2d 1288, 1292 (N.Y. 1979).

As a result of these changed social and economic circumstances, courts began to change the prevailing legal regime surrounding the landlord–tenant relationship. Many courts departed from the traditional no-repair rule through implying what was labeled a warranty of fitness and habitability in a residential lease. By the early 1970s, a majority of state courts, including Iowa, provided common law protection for residential tenants to ensure habitability of the premises. *See, e.g.*,

*Mease*, 200 N.W.2d at 796 (citing cases). These cases abandoned the doctrine of independency and imposed mutual obligations whereby the landlord's right to receive rent was inseparable from the landlord's obligation to provide a fit and habitable premises.

2. *Eclectic analytic underpinnings of doctrine.* The analytic bases for the implied warranty of habitability were eclectic. Some courts drew an analogy to contract law in general and the implied warranties under the Uniform Commercial Code (UCC) in particular. *See, e.g., Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1075 (D.C. Cir. 1970); *Park W.*, 391 N.E.2d at 1292; Mary Ann Glendon, *The Transformation of American Landlord–Tenant Law*, 23 B.C. L. Rev. 503, 547 (1982) [hereinafter Glendon]. This conceptualization had the merit of freeing landlord–tenant law from the law of property, but as some have observed, it is a "strained one" and has a "small resemblance" to implied warranties in the sale of goods. Campbell, 35 U. Ark. Little Rock L. Rev. at 829–30, 830 n.208; Glendon, 23 B.C. L. Rev. at 546–47.

Indeed, the common law implied warranty of habitability has a number of features materially different from contractual theory and the UCC. Unlike under the UCC, the common law warranty of implied habitability ordinarily applies even when the defects are obvious to the tenant at the time of "sale" and even though the tenant reasonably could have discovered the defect by inspection. *See* Glendon, 23 B.C. L. Rev. at 547 & n.285. The UCC allows "as is" transactions, while the majority of courts refuse to allow "as is" transactions in a residential lease as contrary to the implied warranty of habitability. *See id.* at 547 & nn.286–88. The buyer under the UCC has the choice of rejecting the goods or keeping them and suing for damages, while under the implied warranty of habitability the tenant may stay in possession and still not

pay rent. *See id.* at 547 & nn.289–90. In addition, the landlord–tenant relationship is an ongoing relationship. Thus, the analogy comparing the implied warranty of habitability with contract law or the UCC has limited utility and may well be "misnamed." *See* Edward H. Rabin, *The Revolution in Residential Landlord–Tenant Law: Causes and Consequences*, 69 Cornell L. Rev. 517, 521 (1984) [hereinafter Rabin]. *See generally* Campbell, 35 U. Ark. Little Rock L. Rev. at 829–31; Glendon, 23 B.C. L. Rev. at 547–48.

Further, the common law warranty of habitability is implied in law, not in fact. *Kline v. Burns*, 276 A.2d 248, 252 (N.H. 1971). The doctrine just does not rest on the unstated expectations of the parties, or even one of them, but rather on public interests in health and safety. *See* Campbell, 35 U. Ark. Little Rock L. Rev. at 829–31; Glendon, 23 B.C. L. Rev. at 547–48. As a doctrine, implied in law is more in the domain of public law than private ordering. *See Berman & Sons, Inc. v. Jefferson*, 396 N.E.2d 981, 986 n.11 (Mass. 1979) (noting implied warranty caselaw removing the landlord's duty from the "realm of private ordering"); *see also* Glendon, 23 B.C. L. Rev. at 505.

Aside from theory, a review of the cases demonstrates the public law aspects of the common law implied warranty of habitability. One of the important underlying impetuses of the development in the common law of the implied warranty was the public policy embraced in the enactment of housing codes by state and local authorities to protect tenants and ensure a safe and sanitary housing stock.[11] *See Javins*, 428

---

[11]Although the legislative policy behind housing codes—promoting safe and healthy housing—is clear, the housing codes were an ineffective means of advancing the policy. Code enforcement has often been lax if not inconsistent, and the sanctions for violations have been characterized as comparatively mild. Joel R. Levine, *The Warranty of Habitability*, 2 Conn. L. Rev. 61, 73 (1969). According to one commentator,

F.2d at 1080 (finding housing code requires warranty of habitability be implied); *Boston Housing Auth. v. Hemingway*, 293 N.E.2d 831, 840 (Mass. 1973) (emphasizing role of housing codes in stimulating common law development); *Pines v. Perssion*, 111 N.W.2d 409, 412–13 (Wis. 1961) (following old rule of *caveat emptor* is "inconsistent with the current legislative policy regarding housing standards"). *See generally* Glendon, 23 B.C. L. Rev. at 505. As a result, it is not surprising that the leading cases establishing an implied warranty of habitability repeatedly justify the rule by reference to the public interest. *See Foisy v. Wyman*, 515 P.2d 160, 164 (Wash. 1973) (en banc) ("We believe this type of bargaining by the landlord with the tenant is contrary to public policy and the purpose of the doctrine of [the] implied warranty of habitability."). *See generally* Lawrence Berger, *The New Residential Tenancy Law—Are Landlords Public Utilities?*, 60 Neb. L. Rev. 707 (1981); Roger A. Cunningham, *The New Implied and Statutory Warranties of Habitability in Residential Leases: From Contract to Status*, 16 Urb. L. Ann. 3 (1979) [hereinafter Cunningham].

3. *Remedies by tenants for breaches of implied warranty of habitability.* Once courts determined that an implied warranty of habitability existed as a matter of substantive law, questions of remedy inevitably arose. One strand of cases involved the ability of tenants to make necessary repairs and then recover the reasonable cost of labor and materials from the landlord. For instance, in *Pines*, the court held

---

"[h]ousing code enforcement has been notoriously unsuccessful." *Id.* Common law courts adopted the implied warrant of habitability to advance the policies behind housing codes by offering a potentially more effective remedy. Creating a private right of action for violation of public wrongs has solid legal provenance. *See Altz v. Lieberson*, 134 N.E. 703, 704 (N.Y. 1922) (Cardozo, J.); Ezra Ripley Thayer, *Public Wrong and Private Action*, 27 Harv. L. Rev. 317, 320 (1914).

that tenants were entitled to the return of rental deposits plus the costs of labor for making such repairs. 111 N.W.2d at 413. Similarly, in *Marini v. Ireland,* the court approved a recovery when the tenant repaired a cracked toilet and associated water leak. 265 A.2d 526, 528, 535 (N.J. 1970). In *Jackson v. Rivera,* a case that is somewhat similar to the facts of this dispute, the court considered a similar tenant repair remedy, but found, as a matter of fact, that the tenant failed to prove that she paid a certain sum for a new front door and had been required to pay for a window not broken by her. 318 N.Y.S.2d 7, 11 (Civ. Ct. 1971). The notion the tenant may, under some circumstances, perform the repairs needed to bring housing into compliance with the implied warranty is well-established in the caselaw.

4. *Development of Iowa common law implied warranty of habitability.* In *Fetters v. City of Des Moines,* we observed that "the rule of caveat emptor ordinarily applies as between lessor and lessee." 260 Iowa 490, 496, 149 N.W.2d 815, 819 (1967), *overruled in part by Mease,* 200 N.W.2d at 794, 796. Five years later, however, in *Mease,* we embarked on a new course notwithstanding the landlord's stentorian proclamation that a departure from precedent would "wreck our way of life." 200 N.W.2d at 797. Iowa then embraced a common law implied warranty of fitness and habitability in residential leases in *Mease. Id.* at 796.

In holding that every lease implied a warranty of habitability, we relied on the seminal case of *Javins. Id.* at 795.[12] We noted that the

---

[12]*Javins* has been compared to *Goldberg v. Kelly,* 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970), in its importance to protecting low-income people. *See* David A. Super, *The Rise and Fall of the Implied Warranty of Habitability,* 99 Cal. L. Rev. 389, 391 (2011) [hereinafter Super].

*Javins* court emphasized, among other things, that many tenants lack the ability to repair structures and that "[l]ow and middle income tenants . . . would be unable to obtain any financing for major repairs since they have no long-term interest in the property." *Id.* (quoting *Javins*, 428 F.2d at 1078–79). We favorably cited a passage in *Pines* for the propositions that public policies manifested in housing standards and the need and desirability for adequate housing were "too important to be rebuffed by [the] obnoxious legal cliché, *caveat emptor.*" *Id.* at 794 (quoting *Pines*, 111 N.W.2d at 413). We further recognized that because of inequality of bargaining power, "the potential lessee is in no position to dicker about even the most basic necessities." *Id.* at 794–95.

We thus recognized in *Mease* a common law warranty of habitability and declared that under the implied warranty the leased premises "shall remain during the entire term in such condition to maintain the habitability of the dwelling." *Id.* at 796. While we recognized that we had upheld the doctrine of *caveat emptor* in prior cases, we noted that "this court reject[s] application of stare decisis to avoid perpetuating decisional law made obsolete by time." *Id.* at 797–98; *see Haynes v. Presbyterian Hosp. Ass'n*, 241 Iowa 1269, 45 N.W.2d 151 (1950). The *Mease* opinion is written with confidence, and even verve, on the question of whether to adopt a common law implied warranty of habitability in Iowa.

5. *The issue of waiver of the implied warranty of habitability.* The *Mease* court, however, did not expressly decide whether the implied warranty of fitness and habitability could be waived or overridden by agreement of the parties. The *Mease* court did provide a list of factors pertinent in "testing the effect and materiality of the alleged breach." *Id.* at 797. It is not explicit in *Mease* whether the factors were germane to

breach or to remedy. According to *Mease*, factors pertinent in "testing the effect and materiality" of an alleged breach include "whether tenant voluntarily, knowingly and intelligently waived the defects, or is estopped to raise the question of the breach." *Id.*

The precise meaning of this factor, and its relationship to other factors listed by the court, is not elaborated upon in *Mease* or developed in subsequent caselaw. The "testing the effect and materiality" language, however, suggests that there must be a present specific defect before the question of waiver or estoppel may be considered. At least one court has ruled that common law warranty of habitability cannot be waived yet still had a list of factors to determine the materiality of the alleged breach. *See Hemingway*, 293 N.E.2d at 843–44.

In any event, the majority of courts in other jurisdictions that have taken the issue head on have held that the common law implied warranty of habitability cannot generally be waived. These nonwaiver courts emphasized the public policy purposes of the implied warranty and the inability of most tenants to effectively bargain with their landlords. For example, in the leading case of *Javins*, the court stressed that "the old no-repair rule cannot coexist with the obligations imposed on the landlord by a typical modern housing code." 428 F.2d at 1076–77. Following the rationale of *Javins*, the court in *George Washington University v. Weintraub*, held that public policy considerations, including inequality of bargaining power and scarcity of housing, prohibited waiver by private agreement of the parties. 458 A.2d 43, 47 (D.C. Ct. App. 1983). Similarly, in *Green v. Superior Court*, the California Supreme Court emphasized that "public policy requires that landlords generally not be permitted to use their superior bargaining power to negate the warranty of habitability rule." 517 P.2d 1168, 1173 n.9 (Cal. 1974) (en

banc). Other cases offer similar rationales for nonwaiver of the implied warranty of habitability. *See Knight*, 623 P.2d at 273 (stating the "reasons which imply the existence of the warranty of habitability . . . compel the conclusion" that the warranty cannot be waived); *Fair v. Negley*, 390 A.2d 240, 245 (Pa. Super. Ct. 1978) (emphasizing that "[w]ere we to permit waiver of the implied warranty by an express provision in the lease, it would be a rare lease in which the waiver would not appear"); *Foisy*, 515 P.2d at 164–65 (rejecting bargaining between landlord and disadvantaged tenant over habitability); *Teller v. McCoy*, 253 S.E.2d 114, 130–31 (W. Va. 1978) (holding waivers of warranty are against public policy); *see* Shelby D. Green, *Paradoxes, Parallels and Fictions: The Case for Landlord Tort Liability Under the Revised Uniform Residential Landlord-Tenant Act*, 38 Hamline L. Rev. 407, 446 (2015).

There are, however, a few squishy cases which, like *Mease*, ambiguously suggest that whether a tenant had "waived the defect" might be a factor to be considered somewhere along the line in the analysis. *See Kline*, 276 A.2d at 252 (stating that "whether the tenant waived the defects" is a factor in "deciding if there has been a breach"); *Berzito v. Gambino*, 308 A.2d 17, 22 (N.J. 1973) (citing a laundry list of nonexhaustive factors for determining whether there "has been a breach of the covenant of habitability" by the lessor, including "[c]an the tenant be said to have waived the defect or be estopped to complain?"). Whether and under what conditions a waiver would outweigh the other factors is not explained. Further, the precise requirements for such a waiver, such as whether it must be supported by consideration independent of the rental agreement, whether it arises solely from after-the-fact settlement agreements, whether the defect is waived only when there is a failure of the tenant to give the landlord timely notice of the problem and a

reasonable opportunity to repair, or whether there must be evidence of actual and balanced bargaining related to the waiver, is not explored in the cases.

It is possible, however, to partially reconcile the cases. The nonwaiver cases generally stand for the proposition that categorical waivers of the implied warranty of habitability prior to the actual damage that requires repair are barred. Thus, detailed anticipatory language in a form lease agreement waiving the implied warranty of habitability is barred. Once a potential breach occurs, however, the parties may then separately negotiate for the repair, provided that any subsequent agreement is fairly bargained, is supported by consideration independent of the underlying lease, and resolves the underlying habitability problem.

The Restatement (Second) of Property: Landlord and Tenant, however, appears to have taken the view that the implied warranty of habitability was subject to negotiation between the landlord and tenant. The Restatement (Second) provides that "[e]xcept to the extent the parties to a lease validly agree otherwise," a landlord breaches his or her duties if the residential premises is not suitable for residential use. Restatement (Second) of Prop.: Landlord & Tenant § 5.5(1), at 205 (1977 & Supp. 2015) [hereinafter Restatement (Second)]; *see also id.* at § 5.6, at 215.[13] What constitutes a "valid agreement," however, is not explored. *See id.* § 5.5(1), at 205. Further, Restatement (Second) section 5.3, comment c states, "The tenant as a matter of law is unable to waive any remedies available to him at the time of entry, if at the time of entry it

---

[13]If the Restatement (Second) is viewed as generally permitting waivers of the implied warranty of habitability by contract in states that have recognized the common law implied warranty of habitability, it represents a minority position. If, however, the Restatement (Second) recognized that a valid contractual provision cannot be contrary to the public policy embraced in the implied warranty cases, it is on firmer ground.

would be unsafe or unhealthy to use the leased property in the manner contemplated by the parties." *Id.* § 5.3 cmt. *c*, at 190. Additionally, a Reporter's Note states, "The rule of this section does not allow waiver of housing code violations [because of] public policy considerations." *Id.* § 5.3, reporter's note 3; *see also* Cunningham, 16 Urb. L. Ann. at 96–97.

As with the caselaw, academic authorities come to varied conclusions regarding the waivability of the common law implied warranty of habitability. One authority notes that if the implied warranty of habitability read into leases could be waived by the landlord inserting exculpatory language into the same lease, very little would be accomplished. *See* Ted L. Hansen, *Current Interest Areas of Landlord-Tenant Law in Iowa*, 22 Drake L. Rev. 376, 388 (1973) ("[T]he same reasons that necessitate an implied warranty of habitability would also necessitate prohibition against waiver of that warranty.").

Another leading authority noted that "[a]lthough one might be tempted to conclude that if the tenant read, understood, and signed the lease the repugnant clause should be enforced, this conclusion is erroneous." Rabin, 69 Cornell L. Rev. at 582. Because of the market defects including heavy transaction and information costs and the practical absence of competition among landlords concerning such terms, courts should refuse to enforce such exculpatory clauses absent "truly effective bargaining." *Id.* at 583.

**B. Provisions of the Iowa Uniform Residential Landlord and Tenant Act.** In 1972, the Uniform Law Commission promulgated the Uniform Residential Landlord and Tenant Act. Unif. Residential Landlord & Tenant Act, 7B U.L.A. 289 (2001). In 1978, Iowa adopted its version of the Uniform Act. 1978 Iowa Acts ch. 1172 (codified at Iowa Code ch. 562A (1981)). As was noted by a leading contemporary

commentator, the Iowa statute was a close facsimile of the URLTA. *See* Lovell, 31 Drake L. Rev. at 255.

The IURLTA's first substantive provision is a statement of purposes of the Act. Iowa Code § 562A.2. Noteworthy is Iowa Code section 562A.2(2)(*c*), which describes one of the purposes as being "[t]o [e]nsure that the right to the receipt of rent is inseparable from the duty to maintain the premises." *Id.* § 562A.2(2)(*c*). Thus, the statute emphasizes that the obligations of landlords are inextricably intertwined with the right to receive rent. *See id.* Further, the chapter is to be "liberally construed and applied" to promote this underlying purpose. *Id.* § 562A.2(1).

The IURLTA language regarding the duty of the landlord to maintain premises is similar to the URLTA. Iowa Code section 562A.15(1) imposes six categories of duties on landlords, including the duty to "[m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition." *Id.* § 562A.15(1)(*b*). With respect to two categories (landlord's duty to provide trash services and to supply running water and heat), the landlord and tenant of a single-family residence may agree in writing to have the tenant perform the landlord's duties. *Id.* § 562A.15(2). In addition, the landlord and tenant may enter into written agreements that the tenant perform "specified repairs, maintenance tasks, alterations, and remodeling, but only if the transaction is entered into in good faith." *Id.*

The IURLTA also has a strong antiwaiver provision. Iowa Code section 562A.11(1)(*a*) provides that a lease provision in which a party "[a]grees to waive or to forgo rights or remedies," *id.* § 562A.11(1)(*a*), under the Act are "prohibited," *id.* § 562A.11(2). This provision ensures

that heavily lawyered form leases cannot override the substantive provisions of the IURLTA.

**C. Whether the Terms of the Lease Agreement Complies with the IURLTA.** The relationship between the statutory duty of the landlord to "[m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition," the statutory provision prohibiting waivers, and the statutory provision allowing a landlord and tenant to enter into written agreements that "the tenant perform . . . specified repairs," provides the grist for an important issue in this appeal. *See id.* §§ 562A.11(1)(*a*), .15(1)(*b*), .15(2). It has been characterized as "[t]he most difficult area" in residential landlord–tenant law. Rabin, 69 Cornell L. Rev. at 582.

On the one hand, the landlord argues that the specified-repairs provision recognizes the ability of the landlord and tenant to freely enter into agreements allocating the duties and responsibilities of the parties as in any arm's-length contract. The landlord draws support from language in *Mease* suggesting that contractual provisions were a factor in determining the effect or materiality of the alleged breach. 200 N.W.2d at 797.

On the other hand, the tenant counters that if landlords may put contractual provisions in leases requiring tenants to assume what would otherwise be the responsibility of the landlord to make repairs to keep the premises fit and habitable, the substantive protection of the statutory duty of the landlord to provide and maintain a fit and habitable premise would be largely eviscerated. The tenant could end up with "the right to pay rent and precious little else." Lovell, 31 Drake L. Rev. at 254 & n.1 (quoting Julian H. Levi, *The Legal Needs of the Poor: Problems Relating to Real Property* 2 (1964)); *see also Javins,* 428 F.2d at 1080–81

(emphasizing landlords have a continuing obligation during the lease term to maintain the premises in a fit and habitable condition); *Green*, 517 P.2d at 1173 n.9 ("[P]ublic policy requires that landlords generally not be permitted to use their superior bargaining power to negate the warranty of habitability rule."); *Moity v. Guillory*, 430 So. 2d 1243, 1245 (La. Ct. App. 1983) (noting tenant signs one-sided agreement to make repairs when premises in poor condition).

The leading contemporary commentator on the Iowa Act took the latter position. Professor Lovell emphasized that the IURLTA prohibits waiver of rights. Lovell, 31 Drake L. Rev. at 290; *see also* Iowa Code § 562A.11(1)(*a*). According to Professor Lovell,

> The legislature has unequivocally spoken. The warranty of habitability and other rights afforded tenants under both Acts cannot be overcome by the inclusion of waiver clauses in a form lease. This legislation clearly overrides the vague language in *Mease v. Fox* which suggested that the warranty of habitability could be waived.

Lovell, 31 Drake L. Rev. at 290.

Professor Lovell's interpretation is certainly plausible. While the implied warranty of habitability protects tenants substantially, it limits but does not eviscerate the contracting-out provision of Iowa Code section 562A.15(2). A landlord and tenant, for instance, might agree that a tenant perform specified repairs as a handy man, but the obligation to pay the costs remains with the landlord. Or, specific repairs could be limited to minor repairs that do not affect the landlord's duty to provide a habitable premises. But is Professor Lovell's contemporary interpretation the best approach to the Iowa statute?

We note that versions of other states' URLTAs often avoid any ambiguity regarding the scope of any potential contractual waiver by the tenant. For instance, Minnesota law expressly provides that specified

repairs do not include repairs necessary to keep "the premises and all common areas . . . fit for their use intended by the parties." Minn. Stat. § 504B.161(1), (2) (2015). On the other hand, some states expressly authorize open-ended contractual opt-out provisions in unmistakable terms. For example, the Wyoming statute specifically states that "[a]ny duty or obligation in this article may be . . . modified by explicit written agreement signed by the parties." Wyo. Stat. Ann. § 1-21-1202(d) (West, Westlaw current through 2015 Gen. Sess.). Similarly, Mississippi law provides that "the landlord and tenant may agree in writing that the tenant perform some or all of the landlord's duties under this section, but only if the transaction is entered into in good faith." Miss. Code Ann. § 89-8-23(3) (West, Westlaw current through 2016 1st Extraordinary Sess.). The Iowa legislature did not take either approach.

Yet, when we read the Iowa statute in context, a substantial limitation on the ability of the parties to waive basic protections of the Iowa Act as suggested by Professor Lovell may make sense. The IURLTA generally imposes six affirmative statutory duties upon a landlord regarding the leased premises. Iowa Code § 562A.15(1). Specifically, the landlord is required to,

> *a.* Comply with the requirements of applicable building and housing codes materially affecting health and safety.
>
> *b.* Make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition.
>
> *c.* Keep all common areas of the premises in a clean and safe condition . . . .
>
> *d.* Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning, and other facilities and appliances . . . .
>
> *e.* Provide and maintain appropriate receptacles and conveniences . . . for the central collection and removal of ashes, garbage, rubbish, and other waste . . . .

*f.* Supply running water and reasonable amounts of hot water at all times and reasonable heat . . . .

*Id.*

The statute provides that the landlord and tenant may agree in writing that the tenant perform the landlord's duties specified in (*e*) and (*f*) above.  *Id.* § 562A.15(2).  The statute further provides that the landlord and tenant may agree in writing to have the tenant "perform . . . specified repairs, maintenance tasks, alterations, and remodeling, but only if the transaction is entered into in good faith."  *Id.*

Under Apartment Downtown's approach to the "specified repairs" section, however, the landlord's obligation to provide a fit and habitable premises under section 562A.15(1)(*b*) can be undermined by a stock laundry list of specified repairs.  Under the approach of the landlord, the entire listing of statutory obligations related to the fitness of the premises—and not just the obligations under (*e*) and (*f*) above—may be contracted away.  Further, a tenant could be liable for highly expensive repairs that occur at the end of the term of the lease even though the tenant did not cause the uninhabitable condition to arise.

Apartment Downtown's sweeping approach is arguably inconsistent with what the legislature has declared is one of the main purposes of the IURLTA, namely, "[t]o *[e]nsure* that the right to the receipt of rent is *inseparable* from the duty to maintain the premises." *Id.* § 562A.2(2)(*c*) (emphasis added).  Indeed, the statement of purpose reflects the view that the common law doctrine of independency of landlord and tenant duties has been abandoned.  And, the legislature has directed us that in our consideration of matters under the IURLTA, the statute should be "liberally construed and applied" to promote its purposes, certainly including ensuring that "the right to the receipt of

rent is inseparable from the duty to maintain the premises." *Id.* § 562A.2(1)–(2).

Under the landlord's interpretation, however, the right to receipt of rent in the context of single-family dwellings can be severed from the duty to maintain the premises through a detailed and well-lawyered form contract exhaustively listing specified repairs. If the landlord's position in this case is followed, the statute ensures very little with respect to maintaining the premises and does not ensure the receipt of rent is *inseparable* from the duty to maintain the premises.

Indeed, under the freedom-of-contract approach, the duty to maintain the premises is quite separable. While the landlord's duty to maintain a habitable premises has been characterized as critical and central to landlord–tenant law, it would be undermined under the landlord's approach. *See* Campbell, 35 U. Ark. Little Rock L. Rev. at 807; *see also* Lovell, 31 Drake L. Rev. at 310; Richard L. Costella & Christopher S. Morris, *West Virginia Landlord and Tenant Law: A Proposal for Legislative Reform*, 100 W. Va. L. Rev. 389, 419 (1997).

Further, as noted in the caselaw regarding the common law implied warranty of habitability, the duty is rooted substantially in public policy. Comment to section 2.104(d) of the URLTA notes that "[s]tandards of habitability dealt with in this section are a matter of public police power rather than the contract of the parties or special landlord-tenant legislation." Unif. Residential Landlord & Tenant Act § 2.104(d) cmt., 7B U.L.A. 326–28. The comment recognizes that interests beyond the parties are implicated by the implied warranty. Glendon, 23 B.C. L. Rev. at 553. This comment plainly cuts against shifting of the duty to the tenant to provide a fit and habitable premises in lease documents.

It thus could be argued that the legislature's stated purpose that the rent paid by the tenant is inseparable from the landlord's duty to provide a fit and habitable premises is best promoted by limiting, in the case of single-family dwellings, the ability of the landlord to shift its duties to the tenant by contract to subsections (*e*) and (*f*). Iowa Code § 562A.15(1)(*e*)—(*f*), (2). We recognize the rule of construction that the "legislative intent is expressed by omission as well as inclusion, and the express mention of one thing implies the exclusion of others not so mentioned." *Kucera v. Baldazo*, 745 N.W.2d 481, 487 (Iowa 2008) (quoting *Meinders v. Dunkerton Cmty. Sch. Dist.*, 645 N.W.2d 632, 637 (Iowa 2002)). Applying this rule of construction, the expression of contracting authority with respect to subsections (*e*) and (*f*) arguably implies the exclusion of contracting authority with respect to earlier listed obligations of the landlord. Then, looking to the relationship between associated words and phrases, *see T & K Roofing Co. v. Iowa Dep't of Educ.*, 593 N.W.2d 159, 163 (Iowa 1999), the term "specified repairs" could be interpreted to involve matters not affecting the landlord's obligations to provide a fit and habitable premises such as "maintenance tasks, alterations, and remodeling." Iowa Code § 562A.15(2); *see also Acad. Spires, Inc. v. Brown*, 268 A.2d 556, 559 (Essex County Ct. 1970) (listing repairs not within the scope of the implied warranty of habitability); Myron Moskovitz, *The Implied Warranty of Habitability: A New Doctrine Raising New Issues*, 62 Cal. L. Rev. 1444, 1455–63 (1974) (providing examples).

It is not necessary to reach the question of whether the duty of the landlord related to fitness and habitability can be waived by contract. Iowa Code section 562A.15(2) only authorizes the landlord and tenant to agree that the *tenant* will perform certain "specified repairs, maintenance

tasks, alterations, and remodeling" of the premises. This view is advocated by an academic commenter, who interprets the specific-repairs provision of the URLTA to authorize the parties to "enter into a separate written agreement, for adequate consideration, to shift at least some maintenance duties from the landlord to the tenant." Cunningham, 16 Urb. L. Ann. at 96. Such an approach would be consistent with prior caselaw in which tenants made repairs and charged the landlords for the labor and materials. *See, e.g., Marini*, 265 A.2d at 535; *Jackson*, 318 N.Y.S.2d at 11; *Pines*, 111 N.W.2d at 413.

Here, the *tenant* did not perform the repairs. Instead, the *landlord* performed the repairs and attempted to charge the tenant for them. Section 562A.15(2) permits tenants to agree to make certain repairs, but it does not authorize the landlord to make repairs and then shift the costs to the tenants. Iowa Code § 562A.15(2). As a result, even if Iowa Code section 562A.15(2) allows the landlord and tenant to enter into agreements related to a single-family dwelling in which the tenant agrees to make repairs affecting the fitness and habitability of the premises, the landlord cannot prevail in this case on this theory because the landlord, and not the tenant, made the repairs to the door.

**D. Whether the Landlord Complied with the Statutory Duty of Providing a Fit and Habitable Premises in This Case.** The question remains whether the landlord, even if it cannot rely on the provisions of its lease under Iowa Code section 562A.15(2), nonetheless still met its statutory duty to provide a premises in a fit and habitable condition. There is no dispute in this case that without repairing the door, the leased premises would not be in "a fit and habitable condition." *Id.* § 562A.15(1)(*b*). The landlord suggests the duty to provide a fit and

habitable condition is satisfied if repairs are performed, but the costs are shifted to the tenant.

We reject this approach. The scope of a legal duty surely depends upon its context. For example, an insurer does not meet its duty to defend by providing counsel and billing the insured. *See, e.g., Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 223 n.17 (3d Cir. 1999). A duty to support a child or spouse does not allow the party with the obligation to provide physical support and bill the other spouse or child for the costs. Likewise, we do not think the duty of the landlord to provide a habitable premises is so narrow that a landlord may utilize the duty to in effect vest in the landlord a monopolistic right to provide marked up services to the tenant to maintain habitability. If the IURLTA were so interpreted, the statutory duty of the landlord to provide a habitable premises would be eviscerated by allowing a landlord to escape financial obligations through a well-lawyered lease provision. In light of the history of the development of landlord–tenant law, we do not think it can be fairly concluded that the legislature intended the statutory duty of the landlord to "make all repairs and do whatever is necessary to put and keep the premise in a fit and habitable condition" to be satisfied by merely making repairs and shifting the costs to the tenant pursuant to categorical provisions in the original lease agreement.

**V. Damages for Failure to Permit Sublease.**

The landlord–tenant agreement in this case requires the permission of the landlord before the tenant may sublease the premises. The provision is a silent clause in that it does not expressly require that the landlord act in a reasonable or nonarbitrary fashion. Although there is older authority to the contrary, the modern trend is toward recognition of an implied standard of reasonableness in such an agreement. *See*

Mark S. Dennison, *Landlord's Unreasonable Refusal to Consent to Assignment or Sublease*, 102 Am. Jur. Trials 277 § 5, Westlaw (database updated Apr. 2016); *see also Homa-Goff Interiors, Inc. v. Cowden*, 350 So. 2d 1035, 1037–38 (Ala. 1977); Laura Hunter Dietz, et al., 49 Am. Jur. 2d *Landlord and Tenant* § 991, at 905 (2006); Restatement (Second) § 15.2, at 100–13.

Based on these authorities, we conclude the landlord did not act reasonably when it refused to allow the sublease of the premise when it attempted to enforce an unlawful provision in the lease. As a result, the district court erred in not allowing damages as a result of the landlord's refusal to allow the tenant to sublease the premises.

**VI. Automatic Cleaning Deductions From Rental Deposits Under IURLTA.**

**A. Lawfulness of Automatic Carpet-Cleaning Provision.** This brings us to Apartments Downtown's cross-appeal on the merits. The company argues the district court erred in holding the automatic carpet-cleaning provision violated section 562A.12 of the IURLTA.

This lease provision reads as follows:

The carpets throughout the building are professionally cleaned each time apartments turn over occupancy. Tenants agree to a charge starting at $95 (efficiency) not to exceed $225 (6+ bedrooms) being deducted from the deposit for professional cleaning at the expiration of the Lease.

Iowa Code section 562A.12(3) authorizes only three grounds for withholding amounts from a rental deposit: (1) "[t]o remedy a tenant's default in the payment of rent or of other funds due to the landlord pursuant to the rental agreement"; (2) "[t]o restore the dwelling unit to its condition at the commencement of the tenancy, ordinary wear and tear excepted"; and (3) "[t]o recover expenses incurred in acquiring possession of the premises from a tenant" who does not surrender and vacate the

premises in compliance with the rental agreement.  Iowa Code § 562A.12(3)(*a*)–(*c*).

The problem with the carpet-cleaning provision is that it generates an automatic deduction from the rental deposit even when none of the conditions of section 562A.12(3) have been met.  For example, suppose a tenant had Mary Poppins and her magical "Spoonful of Sugar" team restore the carpet to a pristine state at the end of the leasehold.  Certainly, an additional carpet cleaning would not be necessary.  Nonetheless, the charge would still apply.

We are not the first jurisdiction to address the legality of provisions providing for automatic deductions for carpet cleaning in lease agreements.  For instance, in Ohio, which has also adopted the Uniform Residential Landlord and Tenant Act, it is "well-settled" that a provision in a lease agreement providing for an automatic reduction from the rental deposit to pay for professional carpet cleaning is unenforceable. *Chaney v. Breton Builder Co.*, 720 N.E.2d 941, 943 (Ohio Ct. App. 1998), *abrogated in part on other grounds by Parker v. I & F Insulation Co.*, 730 N.E.2d 972, 977–79 (Ohio 2000).  In another case, an Ohio court said,

> In the absence of an affirmative showing, by way of itemization that there was a specific need to clean the carpet, [landlord]'s unilateral deduction was improper.  A lease provision regarding carpet cleaning that is inconsistent with [the Ohio provision regarding rental deposits] is unenforceable.

*Albreqt v. Chen*, 477 N.E.2d 1150, 1153 (Ohio Ct. App. 1983) (citation omitted).  A court in another jurisdiction held that required carpet cleaning at the conclusion of a lease did not amount to "tenant damages, waste or neglect of property" that could be deducted from the rental deposit and thus had to be supported by a separate writing.  *King v. Farkas*, No. 82-2076, 1983 WL 161598, at *2 (Wis. Ct. App. Aug. 9,

1983).  By contrast, in Indiana, an appellate court concluded the landlord could require tenants to steam-clean carpets upon the termination of the lease and deduct cleaning charges from the rental deposit, including charges to pay for professional carpet cleaning. *Castillo-Cullather v. Pollack*, 685 N.E.2d 478, 483 (Ind. Ct. App. 1997), *abrogated in part on other grounds by Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind. 1998).  Indiana law, however, unlike Iowa law, allows the landlord to deduct damages for any breach of the lease from the rental deposit, and the court reasoned that the parties were free to define in the lease the condition to which the premises had to be restored at the conclusion of the lease agreement.  *Id.* at 483 & n.4.

We decline to modify the stated statutory purpose behind rental deposits.  Their purpose is to ensure the tenant faithfully executes her or his duties under the lease agreement.  *See* Iowa Code § 562A.6 (defining a rental deposit as "a deposit of money to secure performance of a residential rental agreement").  The rental deposit is not designed to serve as an advance payment of amounts that will always be due under the lease.  *Cf. Steenes v. MAC Prop. Mgmt., LLC*, 16 N.E.3d 243, 251 (Ill. App. Ct. 2014) (finding that a move-in fee, as "a one-time upfront charge," paid by the tenant with actual knowledge that it was nonrefundable was not a security deposit); *Kopp v. Associated Estates Realty Corp.*, No. 09AP–719, 2010 WL 1510196, at *5–6 (Ohio Ct. App. Apr. 15, 2010) (determining that nonrefundable pet fee and redecorating fee were not rental deposits because they did not secure obligations of the parties, were not intended to be applied toward damages, and were not deducted from the deposit); *Gartz v. J & J Ass'n Holding, LLC*, No. 03–1978, 2004 WL 202876, at *5 (Wis. Ct. App. Feb. 4, 2004) (noting that a landlord's carpet-cleaning fee was permissible under Wisconsin

law because the lease did not provide that the cost would be deducted from the rental deposit).

It is possible that a landlord may be able to impose a nonrefundable charge on tenants for automatic carpet cleaning. *See Stutelberg v. Practical Mgmt. Co.*, 245 N.W.2d 737, 741 (Mich. Ct. App. 1976) (finding a nonrefundable cleaning fee not part of the rental deposit); *Holmes v. Canlen Mgmt. Corp.*, 542 S.W.2d 199, 201–02 (Tex. Civ. App. 1976). Additionally, the statute clearly authorizes the deduction of carpet-cleaning costs from rental deposits if necessary to restore the dwelling unit to the condition at the commencement of the tenancy, beyond the ordinary wear and tear. Iowa Code § 562A.12(3)(*b*).

What a landlord cannot do, however, is impose an automatic carpet-cleaning fee and deduct such charges from a rental deposit. *See Chaney*, 720 N.E.2d at 944; *Albreqt*, 477 N.E.2d at 1153. Under the IURLTA, "[i]f the rental deposit or any portion of a rental deposit is withheld for the restoration of the dwelling unit," the landlord must provide notice and the tenant must have an opportunity to contest actual damages. Iowa Code § 562A.12(3). A landlord cannot by contract extract a waiver of the notice and opportunity to contest provisions when funds are withheld from the rental deposit. *Id.* § 562A.11.

There is one case arguably to the contrary. In *Schaefer v. Murphey*, funds held in a rental deposit were characterized as nonrefundable by contract and the refunded amount of the rental deposit would be reduced by deducting the automatically nonrefundable fee. 640 P.2d 857, 859 (Ariz. 1982). In other words, *Schaefer* stands for the proposition if rental deposits were comingled with funds that the landlord had an unqualified right to receive, the amount of the rental deposit would be reduced by the nondiscretionary payment. The Iowa

IURLTA, however, prohibits commingling of landlord funds with rental deposits.  Iowa Code § 562A.12(2).  Additionally, *Schaefer*'s reasoning is inconsistent with our statutory scheme, which limits the uses of rental deposits and provides a process for challenging a landlord's asserted right to retain them.  *Id.* § 562A.12.  Under Iowa law, rental deposits may only be used for the purposes outlined in Iowa Code section 562A.12.  A landlord may not use a tenant rental deposit for any purpose other than those listed in the statute.  *Smolen v. Dahlmann Apartments, Ltd.*, 338 N.W.2d 892, 894–95 (Mich. Ct. App. 1983) (holding a landlord may not withhold a tenant rental deposit for any purpose not provided for in the statute).  Under Iowa Code section 562A.12(3), "If the rental deposit or any portion of the rental deposit is withheld for the restoration of the dwelling unit, the statement shall specify the nature of the damages."  The landlord may then withhold *only* those amounts necessary to restore the dwelling unit to its prior condition.  Iowa Code § 562A.12(3).

The carpet-cleaning provision providing for automatic deductions from the rental deposit is thus unenforceable under law for the reasons stated above, and the district court's decision relating to it is upheld.  Since we hold the provision violates the IURLTA, we need not address the small claims court's determination that the provision was unconscionable.  *See id.* § 562A.7(1)(*a*) (discussing unconscionability).[14]

---

[14]At trial in the small claims court, the witness for Apartments Downtown testified that notwithstanding the lease language, the company does not automatically deduct for carpet cleaning at the end of the lease term, but makes an individualized assessment of carpet cleanliness.  In other words, Apartments Downtown argues that as a matter of grace, it does not enforce its otherwise impermissible lease provision.  Both the small claims court and the district court treated the charge as an automatic one, and we think this finding is supported by substantial evidence.  Notably, Apartments Downtown's deposit statement—which included the $191 carpet-cleaning deduction—did not describe the condition of the carpet, but simply referred to the automatic charge provision in the lease.  Nor are we persuaded that a landlord can defend an improper charge by arguing it could have assessed the same charge in a

**B. Bad-Faith Penalty.** Apartments Downtown next challenges the $200 in punitive damages the small claims court awarded under the IURLTA, which the district court upheld. Iowa Code section 562A.12(3) requires a landlord to return a tenant's rental deposit within thirty days from the end of the tenancy and receipt of the tenant's mailing address or to furnish the tenant with a written statement explaining the specific reason for withholding the rental deposit or any portion of it. Under section 562A.12(7),

> The bad faith retention of a deposit by a landlord, or any portion of the rental deposit, in violation of this section shall subject the landlord to punitive damages not to exceed two hundred dollars in addition to actual damages.[15]

*Id.* § 562A.12(7).

The landlord argues that the controversies in this case are good-faith disputes and that, as a result, the $200 penalty under Iowa Code section 562A.12(7) must be reversed. The tenant responds by citing *Ikari v. Mason Properties*, 731 N.E.2d 975 (Ill. App. Ct. 2000). In that case, an Illinois appellate court assessed double damages for withholding a rental deposit in bad faith for repair and cleaning after the tenants had left their unit. *Id.* at 980–81. Here, the tenant argues that the retention of the deposits was not "a simple error in computation or confusion over dates." The tenant further notes that the district court found the automatic carpet-cleaning and repair provisions as well as the charges

---

different, proper way. We are not called upon to address the issue of whether a landlord could require the tenant to pay in advance for a carpet cleaning as a separate charge, not included within the rental deposit. We leave that issue for another day.

[15]The legislature has since amended the subsection authorizing punitive damages for the bad-faith retention of a rental deposit. *See* 2013 Iowa Acts ch. 97, § 4. It currently provides for "punitive damages not to exceed twice the monthly rental payment in addition to actual damages." Iowa Code § 562A.12(7) (2015).

under them were unconscionable, thereby supporting punitive damages.[16]

Regardless of the legality or enforceability of the underlying contract provisions, Iowa Code section 562A.12(7) permits an award of punitive damages only for bad-faith retention of the deposit or any portion of the rental deposit. The IURLTA does not define bad-faith retention of deposit by the landlord. This is problematic as bad faith can mean a number of different concepts, depending on context. *See Austrum v. Fed. Cleaning Contractors, Inc.*, ___ F. Supp. 3d ___, ___ 2016 WL 93404, at *6 (S.D. Fla. Jan. 8, 2016) (" 'Bad faith' is an often inconsistently used phrase that has different meanings in different legal contexts."); *Staves v. Johnson*, 44 A.2d 870, 871 (D.C. 1945) (noting that good faith is "not susceptible of exact definition").

In some landlord–tenant cases involving rental deposits, bad faith has been defined somewhat broadly as including "vexatious, unreasonable, or outrageous conduct." *Ikari*, 731 N.E.2d at 980. Similarly, in *McGrath v. Mishara*, the court noted that bad faith could be shown when the landlord "knew or should have known" that the rental deposit should not have been withheld from the tenant. 434 N.E.2d 1215, 1219–20 (Mass. 1982). Using language like "should have known" and "unreasonable," bad faith in *Ikari* and *McGrath* seems to have an objective dimension. In another case, a Texas appellate court declared that bad faith for purposes of withholding a rental deposit is defined as

---

[16]Iowa Code section 562A.7 prohibits an unconscionable provision in a rental agreement. This Code provision provides that a court may refuse to enforce an unconscionable provision or limit its application to avoid an unconscionable result. Iowa Code § 562A.7(1)(*a*). There is no provision for imposition of a penalty for unconscionable provisions in Iowa Code section 562A.7. If a penalty is to be imposed for use of an unconscionable provision, it must be pursuant to Iowa Code section 562A.11(2).

"a breach of faith; willful failure to respond to plain, well understood statutory or contractual obligations; lack of good faith; [or] improper motive." *Hogg v. Jaeckle,* 561 S.W.2d 568, 572 (Tex. App. 1978).

In contexts other than landlord–tenant relationships, bad faith can have an expansive meaning. Bad faith in the insurance context means "the absence of a reasonable basis for denying benefits of the policy and defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 12 (Iowa 1990) (quoting *Dolan v. Aid Ins. Co.,* 431 N.W.2d 790, 794 (Iowa 1988)). In the context of fiduciary duty, bad faith has been described as including "purposeful obliviousness of the known facts suggesting impropriety." *N.J. Title Ins. Co. v. Caputo,* 748 A.2d 507, 514 (N.J. 2000).

While there is no definition of bad faith in the IURLTA, there is a definition of good faith. Under the IURLTA, good faith is "honesty in fact in the conduct of the transaction concerned." Iowa Code § 562A.6(4). Although the definition of good faith under Iowa Code section 562A.6(4) is similar to that found in the Uniform Commercial Code, there is a notable difference. Under Iowa Code section 554.1201(2)(*t*), good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Under Iowa Code section 562A.6(4), however, there is no mention of the objective concept of reasonable commercial standards of fair dealing. Good faith under the IURLTA is limited to "honesty in fact." It is entirely subjective.

It seems that if good faith amounts to "honesty in fact" under the statute, bad faith should be the opposite, or "dishonesty in fact." *Baldwin Cty. Hosp. Auth. v. Trawick,* 504 S.E.2d 708, 710 (Ga. Ct. App. 1998) (" '[B]ad faith' is the opposite of 'good faith.' "); *accord Nelson v. Lindaman,* 867 N.W.2d 1, 13 (Iowa 2015). If so, the test of bad faith is a

subjective test based upon dishonesty in fact by the landlord in the landlord–tenant relationship. *See Minor v. Adams*, 694 S.W.2d 148, 151 (Tex. App. 1985) ("The test of bad faith is whether a person acted in dishonest disregard of the rights of the person concerned.").

Under this approach, intentional or deliberate acts alone do not establish bad faith, but the landlord's intention must also be dishonest. *Leskinen v. Burford*, 892 S.W.2d 135, 136 (Tex. App. 1994). A mere mistake does not establish dishonesty in fact. *See H-L Apartments v. Al-Qawiyy*, 440 N.W.2d 371, 373 (Iowa 1989). Further, the presence of conflicting evidence on a disputed question of fact does not establish bad faith. *Alltex Constr., Inc. v. Alareksoussi*, 685 S.W.2d 93, 95–96 (1984).

We think the dishonesty-in-fact approach to bad faith in the IURLTA under Iowa Code section 562A.12(7) is the best approach in light of the definition of good faith under Iowa Code section 562A.6(4). There is no objective element in bad faith in Iowa Code section 562A.12(7) because there is no objective element in good faith as defined in section 562A.6(4). The burden of proving bad faith, or dishonesty in fact, rests with the tenant. *Lewis v. Jaeger*, 818 N.W.2d 165, 187 (Iowa 2012). Bad faith, being a state of mind, may be established by substantial circumstantial evidence as well as by substantial direct evidence. *Roeder v. Nolan*, 321 N.W.2d 1, 5 (Iowa 1982).

Upon our review of the factual record in this case, we do not find substantial evidence of dishonesty in fact in connection with the use of the unlawful automatic carpet-cleaning charge. We have held that the landlord improperly structured the automatic cleaning charge by linking payment of the mandatory fee to the rental deposit. But while the landlord has used a lease provision that we have found illegal, there is no evidence of subjective dishonesty in fact in this record. The landlord did

not make any misrepresentations to the tenant, but simply used a structure that we have concluded is prohibited by the IURLTA. By simply raising rental rates, the landlord could have obtained the amount of funds sufficient to offset any discretionary decision by the landlord to automatically clean the carpet in an apartment at the end of a tenancy. Under all the facts and circumstances, we cannot say on the current record that there is substantial evidence that the landlord's use of the fully disclosed automatic cleaning charge amounted to dishonesty in fact under Iowa Code section 562A.12(7).

In the alternative, the tenant asserts that the landlord's retention of late fees from the deposit for nonpayment of the cost of the door repair, which it characterized as rent, was in bad faith. The landlord does not challenge the conclusion of the district court that the imposition of these late fees was improper. The landlord does assert, however, that (1) the unpaid maintenance charges under the lease when they are due become a payment owed to the landlord, (2) as a payment due to the landlord, the unpaid maintenance charge is considered part of rent—*see* Iowa Code section 562A.6(9) (defining "rent" as "a payment to be made to the landlord under the rental agreement"),—and (3) as rent, the landlord was entitled to deduct the entire amount owed from the rental deposit under Iowa Code section 562A.12(3)(*a*) (authorizing deduction from rental deposits of to cure default of the tenant "in the payment of rent or of other funds due to the landlord pursuant to the rental agreement"). In any event, as with the automatic carpet-cleaning deposit, no one has claimed that the lease provisions were misrepresented in any way or that the provisions were not fully disclosed in the lease. Although the landlord's argument may be unpersuasive on the merits, we do not think there is substantial evidence in the record to support a conclusion that

the landlord engaged in subjective dishonesty in fact under Iowa Code section 562A.12(7) with respect to the issues raised in connection with deduction of the door-repair expenses.

This is not to say that a tenant has no remedy for use of unlawful provisions in a rental agreement, at least under some circumstances. Iowa Code section 562A.11(2) provides that a landlord may not willfully use a lease provision known by the landlord to be prohibited under the IURLTA. The statute provides for actual damages "and not more than three months' periodic rent and reasonable attorney fees" for knowing use of an illegal provision. *Id.*; *see Caruso v. Apts. Downtown, Inc.*, ___ N.W.2d ___, ___ (Iowa 2016). No claim, however, has been presented in this case under this statutory provision.[17]

## VII. Attorneys' Fees.

In this case, the tenant submitted two affidavits related to attorneys' fees to the magistrate after the matter was submitted. Lead counsel Warnock submitted an affidavit. So did second-chair counsel Boyer. The landlord resisted on grounds of lateness and that granting the fees would cause the small claims court to lack jurisdiction of the case. Before the magistrate could rule on the question, the landlord

---

[17]There is an argument that the penalty provisions of Iowa Code section 562A.11(2) and Iowa Code section 562A.12(7) are mutually exclusive. Iowa Code section 562A.11(2) is arguably directed at the use of unlawful statutory provisions and requires that the provision is known by the landlord to be unlawful. Iowa Code section 562A.12(7) is arguably directed not at illegal provisions in a lease but instead toward factual disputes associated with retention of rental deposits. Each provision has its own statutory penalties. One may question whether the legislature intended the penalty provisions to be cumulative. For example, if a landlord utilizes a provision known to be illegal and is thus subject to penalties under Iowa Code section 562A.11(2), does that expose the landlord to bad-faith penalties under Iowa Code section 562A.12(7) as well? This seems like double dipping. The parties have not raised the question of the relationship between penalty provisions in Iowa Code section 562A.11(2) and section 562A.12(7) in this case. In any event, it is not necessary to consider the relationship in light of our disposition of the contested issues on other grounds.

appealed to district court and the magistrate did not enter a ruling on the attorneys' fee issue. On appeal, the district court concluded that

> the attorney fee affidavit filed by Attorney Christine Boyer on June 21, 2013 includes [a] sufficient breakdown of the attorneys' fees sought by Plaintiff's counsel such that the court can, and does, determine that the fees sought are reasonable.

The district court did not specifically mention the fees of lead counsel Warnock.

On appeal to this court, tenant seeks an award of the attorneys' fees of lead counsel Warnock. The landlord concedes error was preserved on the issue. The landlord argues the district court was in the best position to evaluate the work of counsel and that the fees sought by lead counsel were excessive. The landlord also argues the district court lacked jurisdiction to hear the matter because the claim, with attorneys' fees, exceeded the $5000 jurisdictional limit of small claims court. Finally, the landlord also contends that the tenant was not a prevailing party in the litigation and is therefore not entitled to attorneys' fees. We have rejected these last two claims. Thus, the only remaining issue raised is whether the fees sought by the tenant were excessive, as claimed by the landlord, or reasonable, as claimed by the tenant. *See* Iowa Code § 562A.12(8).

As a preliminary matter, however, we consider a question of whether the tenant was required to file in the district court a motion to enlarge or expand under Iowa Rule of Civil Procedure 1.904 in order to preserve the issue. We have held that because Iowa Code chapter 631 contains no express provision for posttrial motions with respect to appeals to the district court, posttrial motions are not available at this stage of the proceeding. *See Midwest Recovery Servs. v. Cooper*, 465

N.W.2d 855, 856 (Iowa 1991). This case is in a slightly different posture, as it does not involve an appeal from a magistrate to the district court but instead a discretionary appeal from the district court to this court. We have cited *Midwest Recovery*, however, in support of the proposition that there are no posttrial motions on appeal from a small claims court judgment. *See GE Money Bank*, 773 N.W.2d at 539.

The principle embraced in *Midwest Recovery* is fully applicable here. The trial of the matter occurred before the magistrate in this case. The case was then appealed to the district court. *Midwest Recovery* makes clear that a motion for expanded findings is not available when the case is tried under Iowa Code chapter 631. 465 N.W.2d at 855–57. If so, logic dictates there is no basis for a rule 1.904 motion after the district court has determined the small claims appeal.

Aside from our caselaw and the lack of authorization of posttrial motions in Iowa Code chapter 631, grafting rule 1.904(2) into small claims proceedings would be poor policy. The parties in small claims court are often unrepresented by attorneys. Our caselaw, however, demonstrates that Iowa Rule of Civil Procedure 1.904 can be complicated. In close cases, even a skilled lawyer has difficulty determining whether a rule 1.904 motion should be filed. A misstep, however, may result in waiver of a claim or even loss of an appeal. Requiring small claims litigants to understand the intricacies of Iowa Rule of Civil Procedure 1.904(2) cuts against the policy of Iowa Code chapter 631 of providing a swift and simple procedure for determining disputes. Further, the complexity of trial procedure is one of the reasons the implied warranty of habitability has been ineffective. *See* Super, 99 Cal. L. Rev. at 440. Small claims court is, after all, "the people's court" where emphasis belongs on simplicity and fairness for pro se litigants. *Kimble v. Kimble*, 264 P.3d 1229, 1231–32 (Okla. 2011).

With that necessary digression, we now turn to the issue the parties have asked us to decide, namely, whether the fees of lead counsel are excessive. While we could, perhaps, decide the issue on appeal, we think the better approach at this stage is to remand the question of Warnock's attorney's fees to the district court to allow the district court in the first instance to consider the reasonableness of the fee request of lead counsel. We review the district court's award of attorneys' fees for abuse of discretion. *GreatAmerican*, 691 N.W.2d at 732. As a result, the district court should evaluate Warnock's fee application in the first instance. On remand, the district court should further determine the merits of any claim for appellate attorneys' fees. *See Ayala*, 415 N.W.2d at 606; *Crouch*, 287 N.W.2d at 154.

**VIII. Conclusion.**

For the above reasons, we affirm the district court in favor of the tenant on the issue of jurisdiction and cleaning costs. We reverse the decision of the district court adverse to the tenant on the issue of liability for the door repair and on the claim for damages for failure to permit the tenants from subleasing the apartment. We also reverse the district court decision on punitive damages adverse to the landlord under Iowa Code section 562A.12(7).

On the issue of attorneys' fees, we affirm the judgment of the district court as to the reasonableness of fees awarded attorney Boyer, but remand for a determination of reasonable attorney fees in connection with attorney Warnock's work on this case and for consideration of any claim for appellate attorneys' fees. Costs are assessed to Apartments Downtown.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Mansfield, Waterman, and Zager, JJ., who concur in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I respectfully concur in part and dissent in part because I disagree with two conclusions reached by the court. In particular, I do not think small claims courts can award unlimited attorneys' fees without regard to the $5000 jurisdictional limit. Nor do I think the Iowa Uniform Residential Landlord and Tenant Act (IURLTA) makes it illegal for the landlord and the tenant of a single-family home to agree that the tenant will be financially responsible for a repair to an exterior door that is vandalized during the tenancy.

### I. Small Claims Jurisdiction.

I would hold that attorneys' fees count against the jurisdictional limits of the small claims court. The statute provides that the small claims court has jurisdiction over those "civil action[s] for a money judgment where the amount in controversy is . . . five thousand dollars or less . . . exclusive of interest and costs." Iowa Code § 631.1(1) (2011). So, the question is whether attorneys' fees are costs or not. This is an important question because what's good for the goose is good for the gander. If a college student represented by a legal aid agency can recover her attorneys' fees from a landlord in small claims court, so can a debt collector suing an indigent working single parent.

We are interpreting *one* term, "costs," in *one* statute, Iowa Code section 631.1. We cannot have the term mean one thing for plaintiffs who are tenants and something different for other plaintiffs. And although the matter is not free from doubt, I believe the majority's view of the matter is erroneous for several reasons.

First, as the court acknowledges, we have consistently interpreted statutes that use the term "costs" alone to exclude attorney fees. *See*

*Weaver Constr. Co. v. Heitland*, 348 N.W.2d 230, 233 (Iowa 1984) ("We do not agree, however, that the word 'costs' [in chapter 677] should be so liberally stretched as to include attorney fees."); *Turner v. Zip Motors*, 245 Iowa 1091, 1100, 65 N.W.2d 427, 432 (1954) ("[Section 625.1] has always been held to mean the ordinary costs, not including attorney fees."). I am not aware of a single contemporary Iowa statute lacking the phrase "attorney fees" while using the term "costs" alone that has been interpreted to award attorney fees as costs. Why start here?

Second, I am not persuaded that when the general assembly enacted the Unified Court Act in 1972, it intended to adopt caselaw from 1882 and 1932 relating to the old court system. The statute setting forth the jurisdictional limits in the old system was worded differently. *See* Iowa Code § 601.2 (1971) (stating that justice-of-the-peace courts had jurisdiction "where the amount in controversy does not exceed one hundred dollars").

As the majority recognizes, the whole idea of the Unified Court Act was to create a new and better system than what had gone before. And when the legislature did so, it seems to have consciously borrowed from the federal diversity statute. *See* 28 U.S.C. § 1332 (2012) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs . . . ."); 1972 Iowa Acts ch. 1124, § 60 (codified at Iowa Code § 631.1 (1973)) ("A small claim is a civil action for money damages where the amount in controversy in money is one thousand dollars or less, exclusive of interests and costs . . . .").

Under the federal diversity statute, it was well understood that attorneys' fees were separate from "interest and costs." *See, e.g., Mo. State Life Ins. Co. v. Jones*, 290 U.S. 199, 202, 54 S. Ct. 133, 134, 78

L. Ed. 267, 269 (1933); 14AA Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3712, at 806 (4th ed. 2011). So I would be more inclined to follow the federal interpretations of the diversity statute as a guide to interpreting Iowa Code section 631.1. *See Peoples Trust & Sav. Bank v. Armstrong*, 297 N.W.2d 372, 373–75 (Iowa 1980) (noting the resemblance between the wording of Iowa Code section 631.1(1) and that of the federal diversity statute and applying federal diversity precedents to determine when interest counts against the small claims jurisdictional limit).

Furthermore, in the original 1972 Unified Court Act, when the word "costs" was used in other contexts, it clearly did *not* include attorneys' fees. *See* 1972 Iowa Acts ch. 1124, § 65 (codified at Iowa Code § 631.6 (1973)) ("Fees and costs shall be one-half of fees and costs in regular civil actions in district court."). "When the same term appears multiple times in the same statute, it should have the same meaning each time." *State v. Paye*, 865 N.W.2d 1, 7 (Iowa 2015).

Another reason to interpret costs in the small claims jurisdictional statute as something different from attorneys' fees is that it furthers the legislature's goal of "a simpler, easier, and less expensive procedure" in which the parties "need not retain an attorney unless they wished." *Barnes Beauty Coll. v. McCoy*, 279 N.W.2d 258, 259–260 (Iowa 1979). Plainly, if attorneys' fees don't count against the jurisdictional limit, that is an incentive for parties to use attorneys in small claims court. And the presence of an attorney, while generally desirable if the matter is significant, tends to undermine the informality of the proceeding.[18] From

---

[18]The majority uses the apt phrase: "the people's court." Thus, our court declined to give "preclusive effect to small claims adjudications in subsequent regular district court trials [because to do so] would be inconsistent with maintaining the

the very beginning, the legislature made clear that small claims cases don't need attorneys. *See* 1972 Iowa Acts ch. 1124, § 70 (codified at Iowa Code § 631.11 (1973)).

Under the majority's approach, some small claims defendants may be subject to substantial judgments—but without the procedural protections afforded in district court. It is antithetical to the purpose of small claims court to allow potentially open-ended attorney-fee recoveries that could dwarf the stated small claims jurisdictional limit.

Finally, I am not persuaded that the out-of-state authority on which the court relies—particularly *Lettenmaier v. Lube Connection, Inc.*, 741 A.2d 591 (N.J. 1999)—has any bearing on this issue. The New Jersey court rule involved in *Lettenmaier* has different wording from Iowa's statute. *See id.* at 593 (quoting New Jersey Rule 6:1–2(*a*)(1), which mentions only "the amount in controversy").

Furthermore, unlike my colleagues, I would not even give minimal weight to *Lettenmaier*'s citation of two Iowa cases because it *miscited* them. *See id.* at 594–95 (citing *Ayala v. Ctr. Line, Inc.*, 415 N.W.2d 603 (Iowa 1987); *Maday v. Elview-Stewart Sys. Co.*, 324 N.W.2d 467 (Iowa 1982)). *Lettenmaier* cited *Maday* for "examining structure of statute allowing counsel fees and concluding that, because such fees were grouped with costs, they were costs." *Id.* at 594. *Lettenmaie*r cited *Ayala* for "refusing to consider attorney fees in determining whether jurisdictional limit had been exceeded because they are separate and distinct events giving rise to cause of action and cannot be assessed until

---

simplicity and informality of small claims procedures." *Village Supply, Inc. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 554 (Iowa 1981).

liability is established." *Id.* at 595. I can't find those propositions anywhere in *Maday* and *Ayala.*[19]

**II. Lease Provisions Making Tenants Responsible for Costs of Repairing an Exterior Door Damaged by Third-Party Vandalism.**

The lease between Apartments Downtown—on the one hand—and Elyse De Stefano and her housemates—on the other hand—is three pages long. De Stefano testified she did not read the lease before signing it, but she does not dispute that she assented to its terms. She testified that no one misrepresented what was in the lease.

In paragraph 30, the lease provides, "Tenants agree to pay for all damages to the apartment windows, screens, and doors, including exterior unit doors (including random acts of vandalism)." The lease also provides in paragraph 33, "Unless the Landlord is negligent, Tenants are responsible for the cost of all damages/repairs to windows, screens, doors, carpet, and walls, regardless of whether such damage is caused by residents, guests or others." Additionally, the lease contains a $452–$690 estimated cost for the repair or replacement of a prehung entry door.

The lease further provides that the landlord's Iowa City Maintenance would perform all repairs "unless written authorization is secured from Landlord." It states that Iowa City Maintenance charges $70 per hour during regular business hours and $90 per hour during nights and weekends, with a minimum of one hour per service call. Iowa City Maintenance is an alter ego of Apartments Downtown.

---

[19]To be clear, I have no quarrel with how my colleagues have summarized *Maday* and *Ayala* in their majority opinion. But it is wrong to give the *Lettenmaier* decision any credence because it happens to cite to *Maday* and *Ayala.*

The three-page lease has some circling and other marks on it. Some of the marks are in the vicinity of the foregoing provisions. According to the business manager of Apartments Downtown, the presence of these markings confirmed that specific provisions of the lease were actually reviewed with the tenants before they signed it. As summarized by the district court, "The Court finds no evidence in the record that there was a lack of honesty in fact in the conduct of the transaction concerned."

The door replacement charge and the subsequent late fees stemmed from a burglary that occurred at De Stefano's residence in October 2010. De Stefano and the other tenants filed a police report with the Iowa City Police Department. The report stated that the burglary had left the exterior doorframe and the door lock damaged, and the tenants reported two or three cans of beer as well as a bottle of flavored vodka stolen. Apartments Downtown was called to repair the door on October 11—presumably by De Stefano or one of her cotenants.

Apartments Downtown arranged for Iowa City Maintenance to replace the kicked-in door, and the charges were billed to De Stefano and her roommates. The total cost of the repair and replacement was $598.46, which included $318.46 for the replacement door and $280 for four hours of labor. Upon receipt of this charge, one of De Stefano's housemates sent a letter dated November 2 to Apartments Downtown, contesting the charge and advising that the damage was not caused by any of the tenants and that the police investigation was ongoing. In her letter, the tenant referenced paragraph 30 of the lease agreement, which stated, "Tenants agree to pay all damages to the apartment windows, screen, and doors, including exterior unit doors (including random acts

of vandalism)." Yet the tenant said she believed this lease provision to be unconscionable and thus unenforceable by a court.

Apartments Downtown responded on November 17,

> By signing the lease agreement you agree to pay for all damages to the apartment windows, screens, and doors, including exterior unit doors, including random acts of vandalism. If . . . the door was broken down during a burglary, the destruction of the door is considered vandalism . . . . Even though the door was damaged during the break in, and not by a guest of the tenants, it still falls under the basis o[f] a visitor, whether they were a known guest or not . . . . [I]f the police investigation results in the finding of the guilty party that was responsible for the damage, then at that time we would be more than happy to charge said person(s) for the damage. Until then however, the damage incurred to the property fall[s] under the responsibility of the leased tenants. At this time you currently still have an outstanding balance of 598.46 on your account, if this would happen to still be current when December[']s rent comes due, it will accumulate the standard $40.00 late charge.

A principal bone of contention between the parties is whether the IURLTA permits the lessor and the lessee of a single-family home to agree in writing that the lessee will be responsible for the repair of a door damaged by third-party vandalism during the lessee's tenancy. My colleagues ultimately do not decide this issue, but they frame the issue in such one-sided terms that I feel obligated to respond.

Section 562A.15(1) of the IURLTA imposes a warranty of habitability on the landlord. Iowa Code § 562A.15(1) (2011) Among other things, the landlord shall "[c]omply with the requirements of applicable building and housing codes materially affecting health and safety" and "[m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition." *See id.* § 562A.15(1)(*a*)–(*b*). However, the duties in subsection (1) of section 562A.15 are immediately qualified by subsection (2):

> The landlord and tenant of a single family residence may agree in writing that the tenant perform the landlord's duties specified in paragraphs "*e*" and "*f*" [relating to waste removal and the provision of water, hot water, and heat], *and also* specified repairs, maintenance tasks, alterations, and remodeling, but only if the transaction is entered into in good faith.

*Id.* § 562A.15(2) (emphasis added.)

My colleagues present a lengthy argument as to why subsection (2) affects only paragraphs (*e*) and (*f*) of subsection (1) and not the rest of the subsection. In other words, according to this argument, the tenant of a single-family residence may not agree to assume any responsibilities relating to the implied warranty of habitability except those covered by paragraphs (*e*) and (*f*). The majority does not ultimately adopt this position, but it does not acknowledge or even mention the counterarguments against this view.

The biggest problem with this interpretation of the IURLTA is that it gives no effect to the language after "and also" in subsection (2). *See id.* § 4.4(2) (setting forth the presumption that "[t]he entire statute is intended to be effective").

Clearly, the language "and also specified repairs, maintenance tasks, alterations, and remodeling" must refer to landlord duties *other than* those set forth in paragraphs (*e*) and (*f*). Otherwise, the language would be totally superfluous. Driving this point home is that our legislature used the separator "and also," indicating that what followed "and also" was going to be something different from what preceded it. Furthermore, it is difficult to conceive of alterations and remodeling that would be needed to provide waste removal, water, hot water, or heat, if indeed the entire subsection only applied to the duties in paragraphs (*e*) and (*f*).

Equally clearly, the language "and also specified repairs, maintenance tasks, alterations, and remodeling" *must relate to* landlord duties covered by paragraphs (1)(*a*), (1)(*b*), (1)(*c*), or (1)(*d*). For one thing, section 562A.15(2) is placed within the statute and written as if it were a qualifier to section 562A.15(1) as a whole. Moreover, if the terminology "specified repairs, maintenance tasks, alterations, and remodeling" did not relate to matters that would otherwise be landlord duties under paragraphs (1)(*a*), (1)(*b*), (1)(*c*), or (1)(*d*), the language would again be totally superfluous. Under a separate section of the IURLTA, landlords and tenants can *always* agree to various things in their leases if their agreements are not contrary to the terms of the IURLTA—and there is no "good faith" requirement. *See id.* § 562A.9(1) (stating that "[t]he landlord and tenant may include in a rental agreement, terms and conditions not prohibited by this chapter or other rule of law"). The legislature did not need to include the verbiage after "and also" to authorize the same thing.

Furthermore, the term "specified repairs" in subsection (2) seemingly corresponds with language in paragraph (1)(*b*) requiring the landlord to "[m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition." Iowa Code § 562A.15(1)(*b*), .15(2). Under the argument offered by the majority, repairs has to mean something different in two subsections of the same statute. That seems unlikely. *See Paye*, 865 N.W.2d at 7 (indicating that the same term should have the same meaning when it appears multiple times in the same statute).

Oddly, after scouring the country for out-of-state caselaw to support its interpretation of Iowa's sui generis small claims jurisdictional statute, including the aforementioned New Jersey case, the majority

omits discussion of pertinent out-of-state caselaw here—even though we are talking about a uniform act adopted in many jurisdictions.

Existing caselaw interpreting the URLTA undermines the argument presented by the majority. In *Sullivan v. Subramanian*, 2 P.3d 66 (Alaska 2000), the court referenced the duties in Alaska's counterpart to paragraphs (1)(*a*), (1)(*b*), (1)(*c*), and (1)(*d*), and then added, "Barring circumstances that do not exist here, landlords are prohibited from shifting *these* duties to their tenants." *Id.* at 69–70 (emphasis added). In a footnote, the court then revealed the circumstances under which those duties could be shifted by citing the "specified repairs, maintenance tasks, alterations, or remodeling" language in Alaska's counterpart to section 562A.15(3). *Id.* at 70 n.8. The court also cited a prior Alaska case, *see id.*, which indicated that Alaska's counterpart to section 562A.15(3) "governs landlords' attempts to shift duties such as the maintenance of common areas [found in the counterpart to Iowa Code section 562A.15(1)(*b*)] to tenants," *Coburn v. Burton*, 790 P.2d 1355, 1357 (Alaska 1990).

Similarly, in *L & M Investments Co. v. Morrison*, 605 P.2d 1347, 1350 (Or. Ct. App. 1980), the court cited Oregon's counterpart to section 562A.15(1) and said, "[I]t is presumed that the stated rental is for premises in a habitable condition and the landlord is estopped from contending otherwise, at least in the absence of an express written agreement pursuant to [Oregon's counterpart to section 562A.15(3)]."

In *Graber v. Engstrom*, 384 N.W.2d 307, 308 (N.D. 1986), there was a scenario like the present one where the landlord of a single-family residence (a mobile home) argued that the lease had transferred certain habitability obligations to the tenant including the obligation to repair a broken window. Discussing North Dakota's counterpart to Iowa Code

section 562A.15, the court indicated this shifting of responsibility would be lawful:

> Section 47–16–13.1(1), N.D.C.C., among other things, requires a landlord of a residential dwelling unit to comply with the requirements of applicable building and housing codes materially affecting health and safety; to make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition; and to maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, and other facilities and appliances supplied or required to be supplied by the landlord. Section 47–16–13.1(4), N.D.C.C., however, allows the landlord and tenant of a single-family residence to agree in writing that the tenant perform the landlord's duties concerning specified repairs, maintenance tasks, alterations and remodeling if the transaction is entered into in good faith.

*Id.* at 308–09 (citation omitted). However, the court found the lease provision in question was "vague as to the specific maintenance tasks intended to be delegated to" the tenant and therefore upheld the lower court's fact determination that they did not include the matters at issue. *Id.* at 309–10.

Also, the Rhode Island Supreme Court, interpreting a statute somewhat different from the uniform act but with nearly identical wording in relevant part to Iowa Code section 562A.15(2), said,

> It is . . . clear that the landlord may shift the responsibility for performing ordinary specified repairs and maintenance of the rented dwelling premises to the tenant, provided that the parties act in good faith; the parties agree in writing; the agreement is supported by adequate consideration; and the agreement is not in violation of [the Rhode Island statute governing landlord's maintenance duties and the landlord's ability to contract them away].

*State Water Res. Bd. v. Howard*, 729 A.2d 712, 715 (R.I. 1999) (per curiam). In that case, the state leased residential properties to tenants on condition that tenants assumed the responsibility for all necessary maintenance and repairs in exchange for a deduction from the fair

market value of rent. *Id.* at 713. Because the leases did not "shift the responsibility to cure existing or past violations of the applicable housing and building codes to the tenants" and the state had attempted to negotiate the repair-shifting provisions in good faith, the challenged provisions were upheld under Rhode Island law. *Id.* at 715.

I agree that an operating lock on an exterior door is one aspect of habitability. *See Brichacek v. Hiskey*, 401 N.W.2d 44, 47 (Iowa 1987) ("On the record of this case we believe that a landlord is under a duty to provide a front door lock as a part of his overall duty of providing habitable quarters."). And I assume that the burglary here, like most burglaries, resulted in the damaged side-entry door no longer being secure. However, Iowa Code section 562A.15(2) does not provide an exception for "specified repairs so long as they do not relate to habitability." Instead, the exception is simply for specified repairs. Furthermore, if the parties' ability to contract regarding specified repairs were limited by the landlord's duty to perform any repair that relates to habitability, it is easy to foresee that many disputes would arise. Some door and window repairs relate to habitability; some do not. Thus, I believe the IURLTA allows a landlord and a tenant of a single-family home to agree that the tenant will perform specified repairs, where the subject matter is specified and the task to be performed can be fairly characterized as a repair. That is what section 562A.15(2) says.

Tenants living in a single-family residence may be in a better position than a landlord who is not on the scene to safeguard doors, screens, and windows from outside harm. Note that the argument bruited by the majority applies to *all* landlords and tenants of single-family residences. Thus, a lifelong Iowan who rents her home upon

retiring to Florida could not contract that the renter would be responsible for repairing the doors to the home.

The court ultimately finds for De Stefano on an alternative, narrower ground. The court reasons that even if De Stefano might be required to *perform* specified repairs under section 562A.15(2), she cannot be required to *pay* for such repairs when performed by the landlord. While this ground is more plausible, I do not believe the IURLTA draws such a fine line. The IURLTA allows any provision "not prohibited by this chapter or other rule of law," Iowa Code § 562A.9(1), while disallowing any provision that "waive[s] . . . rights or remedies under this chapter," *id.* § 562A.11(1)(*a*). Here, the lease provision merely imposed on the tenant the duty to pay for a repair that the law authorized the parties to agree would be the tenant's responsibility. Significantly, this is not a case where the tenant sought to perform the repair herself or himself and was denied permission to do so. Rather, the lease provided that repairs would be performed by Iowa City Maintenance unless the tenants obtained written authorization from the landlord. The tenants never sought such authorization.

For these reasons, I would hold that Iowa law does not prohibit a landlord and a tenant of a single-family residence from agreeing in the lease that the tenant will pay for the costs of repairing damage to a door resulting from third-party vandalism when the damage occurs during the lease term and is not due to the landlord's negligence. I further note that other provisions in the IURLTA protect the tenant in other, more serious circumstances than a vandalized door. *See id.* § 562A.25 (authorizing the tenant to vacate all or part of the premises and terminate the lease or receive a rent reduction when "the dwelling unit or premises are damaged or destroyed by fire or casualty to an extent that enjoyment of

the dwelling unit is substantially impaired"); *see also* 49 Am. Jur. 2d *Landlord and Tenant* § 704, at 679 (2006) (noting that even a general covenant to repair "merely binds the lessee to make ordinary repairs, as opposed to extensive structural repairs").[20]

### III.  Conclusion.

I agree with the court's resolution of the automatic carpet-cleaning deduction, the bad-faith penalty, and attorneys' fees.  However, in my view, attorneys' fees are included in the $5000 maximum amount in controversy recoverable in small claims.  In addition, I do not believe Iowa law forbids lease provisions requiring the tenant of a single-family home to pay the costs of repairing door vandalism that occurs during the tenancy.  If I were deciding this case, I would affirm the thorough order of the district court except I would reverse the decision on punitive damages and remand for consideration of Attorney Warnock's fees subject to the overall $5000 jurisdictional limit.

Waterman and Zager, JJ., join this concurrence in part and dissent in part.

---

[20]A lessee of real property generally has an insurable interest in the leased property.  *See Neubauer v. Hostetter*, 485 N.W.2d 87, 89–90 (Iowa 1992).  In this case, the record indicates that the landlord had insurance for the premises, but cost of the door repair was below the deductible.